**Affirmed and Opinion Filed April 21, 2020**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-18-00820-CV

**BRIGHT EXCAVATION, INC., Appellant**
**V.**
**POGUE CONSTRUCTION CO., LP AND HARTFORD FIRE INSURANCE**
**CO., Appellees**

**On Appeal from the 191st Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-17-00591**

## MEMORANDUM OPINION

Before Justices Myers, Osborne, and Nowell
Opinion by Justice Nowell

This is an appeal from a final take-nothing judgment following the granting of a traditional and no-evidence motion for summary judgment and a motion for attorney's fees. Bright Excavation, Inc., a subcontractor, sued the general contractor, Pogue Construction Co., LP, and its surety, Hartford Fire Insurance Co., for breach of contract and other causes of action seeking additional payment for excavation work Bright claims was beyond the scope of its contract. In seven issues, Bright argues the trial court erred by granting summary judgment because the subcontract is ambiguous and the evidence raised fact issues: on waiver and excuse defenses to

the contractual time limits for submitting change orders; on Bright's causes of action for quantum meruit, promissory estoppel; and on the bond claim against Hartford. We conclude the subcontract is not ambiguous, the work performed was within the scope of work, and Bright was not entitled to additional compensation. We also conclude Bright's other causes of action fail because there is an express contract covering the subject matter and no breach of the subcontract to support the bond claim. We affirm the trial court's judgment.

## Background

Lancaster Independent School District hired Pogue as the general contractor on a project to build two new elementary schools. This dispute concerns only the Pleasant Run school. Bright was invited to bid on the earthwork portion of the project and received a bid package from Pogue containing the plans and specifications and other relevant documents. Attached to the specifications was a geotechnical report of the subsurface conditions at the site. Section 00 31 32 of the specifications instructed, "Report and log of borings are available for Contractor's information but is not a warranty of subsurface conditions, nor is it a part of the Contract Documents." Section S1.0 of the plans, regarding treatment of the soil beneath the building, specified: "Perform any cut operations to expose to the top of the limestone strata. For proposal purposes, contractor shall assume 6 ft of remove and replace

shall be necessary. The geotechnical engineer or a representative of the geotechnical engineer shall verify the top of the tan limestone."[1]

The geotechnical report contained an analysis of subsurface materials at the selected locations for purposes of formulating appropriate geotechnical design parameters for the new construction. Attached to the report were logs of widely-spaced borings taken at the site. The report indicated the recommendations were developed from borings depicting the subsurface conditions only at the specific boring locations and at the times designated in the boring logs. It stated that subsurface conditions at other locations may differ from those observed at the boring locations and the subsurface conditions at the boring locations may vary at different times of the year. The report warned that the scope of work "may not fully define the variability of subsurface material and conditions that are present on the site."

Bright reviewed the bid package and noted the instruction to assume six feet of remove and replace would be necessary. However, based on its employees' experience, Bright concluded it would not be economically feasible to excavate and replace six feet of material. Rather, Bright interpreted the boring logs to reflect that the top of tan limestone was expected to be encountered between two and four feet below ground level. Bright based its bid on the shallower depth for the top of tan limestone. According to Bright's witnesses, it disclosed its bidding process to Pogue

---

[1] The documents in the record refer to this strata variously as "tan shaly limestone," "tan limestone," or "shale limestone." For simplicity we use the term tan limestone.

in a scope review prior to the final acceptance of the bid. Pogue's witnesses deny that these discussions took place.

Bright's bid for the earthwork was accepted by Pogue. Prior to execution of the subcontract, Pogue sent a notice to proceed, which contained a listing of the earthwork as described in the plans and specifications, to Bright on May 10, 2016. Line item 57 in the initial notice to proceed stated, "Building Pad Subgrade preparation- overexcavation to limestone, moisture condition in 8" lifts with 1' select fill cap or flex base." Later that day, Pogue sent a revised notice to proceed changing line item 57 to read, "Building Pad Subgrade preparation- overexcavation to limestone, prep for ½" movement per Geotechnical Report with select fill of flexbase." Bright contends this change in the notice to proceed reflected Pogue's agreement that Bright would excavate to the top of tan limestone in accordance with the geotechnical report.

Bright and Pogue executed the subcontract on June 1, 2016 and June 21, 2016 respectively. Bright agreed to furnish all labor, material, equipment, services and supplies required for a complete job of Earthwork, as specifically described in the exhibit A.1, "in strict accordance with the project plans, specifications, notes, codes, ordinances, manufacturers' recommendations and all applicable local, state and federal regulations." Pogue agreed to pay Bright for described work and materials, and Bright agreed to accept, the sum of $945,000.00. Exhibit A.1 included section 31A, which referenced the earthwork sections of the plans and specifications. Line

item 57 had the same language as item 57 in the revised notice to proceed. The subcontract represented "the entire and integrated Agreement between the parties and supersede[d] all prior negotiations, representations, or agreements, whether written or oral."

Bright began its work in June 2016. Mike Lipka, Bright's field superintendent, testified that on June 21, Lee Johnson, the testing engineer onsite, instructed them to dig through a thin layer of hardpan to get to hard shale. Hardpan is a mix of clay and shale that is softer than actual shale limestone. Bright contends the geotechnical report did not accurately reflect the depth of the top of limestone and it was required to excavate an additional two feet or more beyond the depths it anticipated based on the boring logs. Bright claims this was beyond the scope of work reflected in item 57 and caused Bright to incur over $325,000 in expenses.

On July 14, 2016, Bright's senior estimator, Ken Swayze, e-mailed Pogue's project manager, Landon Kids, requesting a meeting to discuss overages on the project. Swayze stated that Bright had "gone over roughly 35% on both haul off and select fill due to rock being deeper than indicated on borings." After reviewing the plans and specifications, Kids determined that the work Bright performed was within its scope of work under the contract and a change order was not warranted. Pogue also claimed that a request for a change order was not timely because Bright discovered the alleged overage more than 21 days before it contacted Pogue. Bright

also never submitted an itemization of the additional expenses to support a request for a change order.

On August 15, 2016, Bright made a claim for over $1.2 million on Pogue's payment bond issued by Hartford. Bright later supplemented the claim to state that over $760,000 was due. On January 16, 2017, Bright filed this suit against Pogue and Hartford, asserting claims for breach of contract, quantum meruit, promissory estoppel, unjust enrichment, and payment under the payment bond. In addition to its answer raising affirmative defenses, Pogue filed a counterclaim to recover its attorney's fees under the terms of the subcontract.

Pogue subsequently filed a traditional and no-evidence motion for summary judgment on all of Bright's claims. Among other grounds, Pogue stated that Bright had no evidence that Pogue breached the contract. The trial court granted the motion for partial summary judgment without specifying the grounds for its ruling. Pogue filed a motion for attorney's fees with supporting affidavits. After a hearing on the motion, the trial court granted the motion and rendered a final judgment that Bright take nothing on its claims and that Pogue recover its attorney's fees. This appeal followed.

### Standard of Review

We review the trial court's summary judgment de novo. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). A no-evidence motion for summary judgment under rule 166a(i) must challenge specific elements of the

opponent's claim or defense on which the opponent will have the burden of proof at trial. TEX. R. CIV. P. 166a(i). The opponent must then present summary judgment evidence raising a genuine issue of material fact to support the challenged elements. *Id.* A party moving for traditional summary judgment has the burden to prove that there is no genuine issue of material fact and it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). If, as here, the trial court's order does not state the grounds on which it granted summary judgment, we will affirm if any of the theories advanced by the summary judgment movant are meritorious. *Pain Control Inst., Inc. v. GEICO Gen. Ins. Co.*, 447 S.W.3d 893, 897 (Tex. App.—Dallas 2014, no pet.). "When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor." *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005).

## Discussion

### A.    Ambiguity

In its first two issues, Bright argues the trial court erred by granting summary judgment because the subcontract is ambiguous regarding Bright's scope of work. Specifically Bright contends the subcontract is ambiguous as to the depth to which Bright was obligated to excavate in exchange for the subcontract price of $945,000.

Determining whether a contract is ambiguous is a question of law. *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983). Absent ambiguity, a contract is construed as a matter of law. *Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 305 (Tex. 2015). We must ascertain and give effect to the parties' intentions as expressed in the writing itself. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011). In discerning the parties' intent, "we must examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *Id.* (quoting *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003)) (internal quotation marks omitted). No single provision taken alone is given controlling effect; rather, each must be considered in the context of the instrument as a whole. *Plains Expl.*, 473 S.W.3d at 305. We also give words their plain, common, or generally accepted meaning unless the contract shows that the parties used words in a technical or different sense. *Id.*

A contract is not ambiguous if the contract's language can be given a certain or definite meaning. *El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 806 (Tex. 2012). But if the contract is subject to two or more reasonable interpretations after applying the pertinent construction principles, the contract is ambiguous, creating a fact issue regarding the parties' intent. *Id.* Summary judgment is not the proper vehicle for resolving disputes about an ambiguous contract. *Plains Expl.*, 473 S.W.3d at 305.

Extrinsic evidence of the parties' intent is not admissible to create an ambiguity. *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450 (Tex. 2008) (explaining that evidence outside the four corners of a contract cannot be used to create an ambiguity). However, the contract may be read in light of the circumstances surrounding its execution to determine whether an ambiguity exists. *Plains Expl.*, 473 S.W.3d at 305. The rule that extrinsic evidence in not admissible to create an ambiguity "'obtains even to the extent of prohibiting proof of circumstances surrounding the transaction when the instrument involved, by its terms, plainly and clearly discloses the intention of the parties, or is so worded that it is not fairly susceptible of more than one legal meaning or construction.'" *Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 732 (Tex. 1981) (quoting *Lewis v. E. Tex. Fin. Co.*, 146 S.W.2d 977, 980 (Tex. 1941)). Mere disagreement over the interpretation of an agreement does not necessarily render the contract ambiguous. *Plains Expl.*, 473 S.W.3d at 305.

Both parties agree that Bright was obligated to excavate to the top of tan limestone as verified by the geotechnical representative. According to Bright, the dispute is over the amount of money Bright would be paid for that work. Pogue contends Bright agreed to perform the scope of work, including excavating to the top of tan limestone as verified by the geotechnical representative, for a fixed price. A change order would only be warranted if Bright had been required to perform work beyond the defined scope of work.

Focusing solely on line item 57, Bright asserts the scope of work is ambiguous. Item 57 states, "Building Pad Subgrade preparation- overexcavation to limestone, prep for ½" movement per Geotechnical Report with select fill of flexbase." Bright contends the phrase "per Geotechnical Report" limits Bright's scope of work to excavating only to the depths of limestone shown in the boring logs and any additional excavation would be at an additional cost.

Even though the specifications state the geotechnical report was provided for information only and the borings are not a warranty of subsurface conditions, the references in the subcontract to the report require an examination of its substance. The difficulty with Bright's interpretation is that the geotechnical report does not support the contention that Bright was obligated to excavate only to the depths of limestone shown in the boring logs. The report states its recommendations were based on the information from widely spaced test borings depicting the "subsurface conditions only at the specific boring locations and at the particular time designated in the logs." The geotechnical report specifically noted that subsurface conditions at other locations may differ from those observed at the boring locations and the scope of work may not fully define the variability of subsurface materials and conditions present on the site. And it warned that the nature and extent of variations between borings may not become evident until construction.

The report contains recommendations for improvements to obtain ½ inch and 1 inch movement of the floor slab. The school district in this case selected the ½ inch movement option. The report states:

6.2.1 Subgrade Improvement for ½ inch Movement

Movement of the floor slab could be reduced to about ½ inch, by improving subsurface conditions to the top of tan shaly limestone encountered at depths ranging from 2 to 4 ft below existing grade in the building borings. Tan shaly limestone was not encountered in Borings 9, 10, and 15, but it is believed to be close to the termination depth of 5 ft below existing grade. Subsurface improvement can consist of over-excavating the existing clayey soils to the top of tan shaly limestone and backfilling with non-expansive material to achieve final grade. *During construction, our office personnel should verify the top of tan shaly limestone.* In choosing this method of slab movement reduction, the Owner is accepting some post construction seasonal movement of the floor slab (about ½ inch).

This section indicates that limiting slab movement to ½ inch would require improving the subsurface conditions to the top of tan shaly limestone, which was encountered in some of the borings at depths of two to four feet below ground. However, three borings did not encounter tan limestone, though it is expected to be close to five feet below ground. The report explains that subsurface improvement means "over-excavating the existing clayey soils to the top of tan shaly limestone and backfilling with non-expansive material to achieve final grade." It emphasizes that during construction, the engineer's office should verify the top of tan limestone.

Bright interprets the phrase "per Geotechnical Report" in line item 57 as limiting its scope of work to excavating to the depth of limestone shown in the boring

logs. Based on the language in the geotechnical report this is not reasonable. Although the report notes that tan limestone was encountered in some of the borings at relatively shallow depths, the recommendation for achieving ½ inch slab movement was to "over-excavate to the top of tan shaly limestone," which should be verified by the geotechnical engineer during construction. Nothing in the report indicates that the contractor should excavate only to the depths of limestone shown in the boring logs. Indeed, three of the borings did not encounter limestone at all. Nor does the geotechnical report state that a contractor would be entitled to additional compensation for excavating beyond the depths of limestone shown in the boring logs.

Looking beyond the geotechnical report, we consider the entire contract to determine the intent of the parties and whether the contract is ambiguous. Line item 57 is one of 71 line items making up Exhibit A.1 to the subcontract. It does not expressly deal with the price Bright agreed to accept for its work. At the beginning of the subcontract, Bright agreed to provide *all* labor, material, equipment, services, and supplies required for a complete job of Earthwork in strict compliance with the project plans and specifications. Pogue agreed to pay Bright for described work and materials, and Bright agreed to accept, the sum of $945,000.00. Sheet S1.0 of the plans called for a bid to perform "any cut operations to expose the top of the shaly limestone strata" and instructed that the geotechnical engineer or a representative shall verify the top of limestone.

–12–

In exhibit A.1 to the subcontract, Bright agreed to provide *all* labor, material, equipment and supervision required to complete the Earthwork scope of work including but not limited to the items in section 31A. This included furnishing and installing all portions of the scope of work described in several specified sections of the specifications. Section 1.1.3 of the subcontract general provisions provides that the subcontractor's work

> shall include the performing and furnishing by Subcontractor of all supervision, labor, materials, plant, scaffolding, hoisting, tools, equipment, supplies, and all other things necessary for the construction and completion of the Work, as described in its Subcontract, and all Work incidental thereto or reasonably inferable therefrom, in strict accordance and in full compliance with the terms of the Contract Documents.

Thus, Bright agreed to provide all work necessary to perform the work described, which Bright concedes included excavating to the actual, not estimated, top of tan limestone, for the contract price. Bright presented no evidence that the Earthwork scope of work in the plans and specifications referenced in the subcontract was limited to excavation to depths shown only in the boring logs. Bright's interpretation that line item 57 limited its scope of work to excavating to the depths indicated in the boring logs is inconsistent with the remainder of the subcontract.

Further, the subcontract provides that it is the entire integrated agreement between the parties and supersedes all prior negotiations, representations, or agreements. This clause precludes any agreement prior to the subcontract, such as

–13–

an agreement that the "per geotechnical report" language in line item 57 actually meant Bright would be entitled to additional compensation if it excavated beyond the depths shown in boring logs.

Bright also contends the risk of unknown subsurface conditions was placed on the contractor or owner, but the express language of the contract and subcontract belie this contention. In its subcontract, Bright agreed that it "assume[d] all obligations, risks and responsibilities to Contractor which Contractor has assumed toward the Owner." Section 00 31 32 of the specifications states that:

> 1.04 RESPONSIBILITY
>
> A. Bidders are expected to examine the site and subsurface investigation reports and then decide for themselves the character of the materials to be encountered.
>
> B. The Owner and Architect assume no responsibility for variations of subsoil quality or conditions.
>
> C. The Owner and the Architect assume no responsibility for any conclusions or interpretations made on the basis of subsurface information contained in the contract documents.

Thus, Bright, not Pogue or the school district, assumed the risk of the conclusions and interpretations Bright made based on the subsurface information contained in the geotechnical report.

In addition, Bright acknowledged that the subcontract and the contract documents were adequate and sufficient to provide for the performance and completion of the work and included "all Work, whether or not specified, which reasonably may be inferred to be required for the completion of the Work in

accordance with all applicable laws, codes and professional standards." The risk that the top of limestone was deeper than indicated in boring logs fell on Bright because the scope of work under the subcontract included excavating to the top of limestone.

Reviewing the contract as a whole, we conclude Bright's interpretation of the subcontract is not reasonable and the contract is not ambiguous. *See Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996) ("For an ambiguity to exist, both interpretations must be *reasonable.*"). We overrule Bright's first and second issues. Because Bright was not entitled to additional payment, we need not address issues three and four regarding waiver or excuse for Bright's failure to timely submit a change order. TEX. R. APP. P. 47.1.

## B. Alternative claims

Because we conclude there is no evidence that Pogue breached the subcontract and the subcontract includes the subject matter, summary judgment was proper on Bright's alternative claims of quantum meruit, promissory estoppel, and on the payment bond. *See Vortt Exploration Co. v. Chevron U.S.A., Inc.*, 787 S.W.2d 942, 944 (Tex. 1990) (quantum meruit applies only when no express contract covers the subject matter); *Guar. Bank v. Lone Star Life Ins. Co.*, 568 S.W.2d 431, 434 (Tex. Civ. App.—Dallas 1978, writ ref'd n.r.e.) (promissory estoppel not applicable if promise is part of valid contract); *Dealers Elec. Supply Co. v. Scroggins Const. Co., Inc.*, 292 S.W.3d 650, 653 (Tex. 2009) (noting payment-bond beneficiary who has not been paid may sue principal or surety, jointly or severally, on payment bond).

We overrule Bright's fifth, sixth, and seventh issues.

## Conclusion

We conclude the contract is not ambiguous and there is no evidence Pogue breached the contract. Accordingly, the trial court did not err by granting summary judgment on Bright's causes of action. We affirm the trial court's judgment.


/Erin A. Nowell/
ERIN A. NOWELL
JUSTICE

180820F.P05



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

BRIGHT EXCAVATION, INC.,
Appellant

No. 05-18-00820-CV     V.

POGUE CONSTRUCTION CO., LP
AND HARTFORD FIRE
INSURANCE CO., Appellees

On Appeal from the 191st Judicial
District Court, Dallas County, Texas
Trial Court Cause No. DC-17-00591.
Opinion delivered by Justice Nowell.
Justices Myers and Osborne
participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellees Pogue Construction Co., LP and Hartford Fire Insurance Co. recover their costs of this appeal from appellant Bright Excavation, Inc.

Judgment entered this 21st day of April, 2020.