# Supreme Court of Texas

No. 21-0036

Thomas Brandon Perthuis,

*Petitioner*,

v.

Baylor Miraca Genetics Laboratories, LLC,

*Respondent*

On Petition for Review from the
Court of Appeals for the First District of Texas

JUSTICE HUDDLE, joined by Justice Boyd, dissenting.

Parties frequently agree to written contracts that are incomplete, unclear, or both. When disputes over such contracts arise, Texas courts have long applied a settled methodology for discerning what the parties' agreement actually was. If a written contract is susceptible to two or more reasonable interpretations, it is deemed ambiguous, and the parties may introduce extrinsic evidence to shed light on its meaning. Following this methodology allows courts to enforce the contract upon which the parties actually agreed, even if they were less than perfect scriveners. This, in turn, allows courts to hew as closely as possible to our ideal of freedom of contract: the notion that parties are allowed to

make—and a Texas court should enforce—any legal contract to which the parties saw fit to agree.

Today the Court replaces this well-settled methodology with a default rule—the procuring-cause doctrine—which our Court has barely mentioned in a century. The majority dusts it off, imports it from the broker context, and, for the first time, applies it in the at-will-employment context. The Court's adoption of this default rule threatens the expectations of at-will employers and employees who have agreed to a commission structure but, for whatever reason, failed to reduce it to writing with perfect clarity. They will be surprised to learn that, under the default rule the Court adopts today, an at-will salesperson is entitled to commissions for any sale—here, perhaps hundreds or thousands of sales—a jury determines the salesperson "set in motion." And they will be stunned to learn that, under the default rule, the entitlement to commissions may extend *years* after their employment relationship ended.

Today's decision is at odds with our precedents for resolving contractual disputes and with the common understanding of the nature of at-will relationships. And it is far-reaching: while reported decisions on commission disputes are relatively few, the Texas Workforce Commission adjudicates as many as 20,000 wage claims, including claims for unpaid commission, *each year*. I would not be so quick to expand the procuring-cause doctrine to the at-will-employment context. I would instead remand to the trial court for a new trial in which a jury would determine the meaning of the parties' agreement that Perthuis's commission "will be 3.5% of [his] net sales" based on the parties'

extrinsic evidence regarding their own contract negotiations, the employer's policies and practices, and common industry practice. Because the Court does otherwise, I respectfully dissent.

## I

Time and again, this Court has reiterated its commitment to protecting freedom of contract.[1] As stewards of this "paramount public policy," *Energy Transfer Partners, L.P. v. Enter. Prods. Partners, L.P.*, 593 S.W.3d 732, 738 (Tex. 2020) (quoting *Wood Motor Co. v. Nebel*, 238 S.W.2d 181, 185 (Tex. 1951)), we have made clear that "courts will not rewrite agreements to insert provisions parties could have included or to imply restraints for which they have not bargained." *In re Marriage of I.C. & Q.C.*, 551 S.W.3d 119, 124 (Tex. 2018) (quoting *Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 646 (Tex. 1996)).

Our primary goal in interpreting any contract is, of course, to give effect to the parties' intent as expressed in the contract itself. *Monroe*

---

[1] The examples are recent and abundant. *E.g.*, *Waste Mgmt. of Tex., Inc. v. Stevenson*, 622 S.W.3d 273, 286 (Tex. 2021) ("'Texas strongly favors parties' freedom of contract,' under which parties may 'bargain for mutually agreeable terms and allocate risks as they see fit.'" (quoting *Gym-N-I Playgrounds, Inc. v. Snider*, 220 S.W.3d 905, 912 (Tex. 2007))); *Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 230 (Tex. 2019) ("We have long recognized the strongly embedded public policy favoring freedom of contract. And, absent a compelling reason, courts must respect and enforce the terms of a contract that the parties have freely and voluntarily made." (citations omitted)); *Endeavor Energy Res., L.P. v. Discovery Operating, Inc.*, 554 S.W.3d 586, 595 (Tex. 2018) ("[T]he law's 'strong public policy favoring freedom of contract' compels courts to 'respect and enforce' the terms on which the parties have agreed." (quoting *Phila. Indem. Ins. Co. v. White*, 490 S.W.3d 468, 471 (Tex. 2016))).

*Guar. Ins. Co. v. BITCO Gen. Ins. Corp.*, 640 S.W.3d 195, 198–99 (Tex. 2022). To do so, we look first to the contract's text. *See U.S. Metals, Inc. v. Liberty Mut. Grp., Inc.*, 490 S.W.3d 20, 23 (Tex. 2015). We consider the writing in its entirety, harmonizing and giving effect to all its provisions so that none will be rendered meaningless. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011). And we interpret each provision with reference to the entire agreement, as opposed to giving one provision controlling effect. *Moayedi v. Interstate 35/Chisam Rd., L.P.*, 438 S.W.3d 1, 7 (Tex. 2014).

When parties disagree about the meaning of their written contract (as they often do), we apply a well-settled methodology to resolve the dispute. The first step is to determine whether the contract is ambiguous. *See Cook Composites, Inc. v. Westlake Styrene Corp.*, 15 S.W.3d 124, 131 (Tex. App.—Houston [14th Dist.] 2000, pet. dism'd by agr.) ("There are two steps to an ambiguity analysis. First, we apply the applicable rules of construction and decide if the contract is ambiguous." (citing *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983))). Whether a contract is ambiguous is a question of law, *Nettye Engler Energy, LP v. BlueStone Nat. Res. II, LLC*, 639 S.W.3d 682, 690 (Tex. 2022), and the parties need not plead ambiguity for the court to determine that a contract is ambiguous. *See Progressive Cnty. Mut. Ins. Co. v. Kelley*, 284 S.W.3d 805, 808 (Tex. 2009) (holding a contract ambiguous despite neither party arguing ambiguity).

The majority recognizes that a contract is unambiguous if its language can be "given a certain or definite legal meaning or interpretation." *Ante* at 9 (quoting *El Paso Field Servs., L.P. v. MasTec*

4

*N. Am., Inc.*, 389 S.W.3d 802, 806 (Tex. 2012)).   But our law also recognizes that, alas, some contracts *are* ambiguous.   *See, e.g., J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 232 (Tex. 2003) ("[W]e conclude that the arbitration agreement is ambiguous.").   An ambiguity exists when a contract is subject to two or more reasonable interpretations after applying the pertinent rules of construction.   *Id.* at 229.   If a contract is ambiguous, our precedents make clear that the parties may introduce extrinsic evidence to shed light on its meaning, which becomes a fact issue for the jury.   *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 480 (Tex. 2019).

## II

The majority offers various rationales for applying the procuring-cause doctrine rather than considering extrinsic evidence.   First, it concludes the agreement is not ambiguous but merely silent about which sales constitute Perthuis's "net sales."   *Ante* at 18.   Next, it deems the procuring-cause doctrine itself to be a principle of contract construction that "reduce[s] the range of interpretations that qualify as 'reasonable.'"   *Id.*  Finally, it asserts that even if the agreement were ambiguous, there would be no need for extrinsic evidence because it should be construed against its drafter.[2]  *Id.* at 20.   The upshot, under any of these theories,

---

[2] Texas courts have noted the doctrine of *contra proferentem* is one of last resort, *Evergreen Nat'l Indem. Co. v. Tan It All, Inc.*, 111 S.W.3d 669, 676 (Tex. App.—Austin 2003, no pet.), and have applied it mostly in the insurance context.  *See, e.g., Gonzalez v. Mission Am. Ins. Co.*, 795 S.W.2d 734, 737 (Tex. 1990).   I harbor serious doubts that it would apply to resolve an ambiguity here.  *See Horizon Pools & Landscapes, Inc. v. Sucarichi*, No. 01-15-01079-CV, 2016 WL 7164025, at *3 (Tex. App.—Houston [1st Dist.] Dec. 8, 2016, no pet.) ("The ostensible rule of construction that ambiguities in a contract should be

is that we never reach the point at which the parties offer competing evidence of what their imperfectly drafted commission agreement actually meant, because the procuring-cause doctrine supplies the answer.

The majority, like Perthuis, relies on *Goodwin v. Gunter*[3] and *Keener v. Cleveland.*[4] But those cases involved seller–broker relationships in the nature of an independent-contractor relationship, each formed to consummate the sale of a single piece of real property. The procuring-cause doctrine makes sense in that context, and I do not suggest disturbing *Goodwin* or *Keener*. But the doctrine is a misfit in the employment-at-will context, in which the parties likely (1) understand their obligations to one another to end when their employer–employee relationship does, absent an express agreement to the contrary; and (2) adhere to established policies or industry practices, or both, in determining how commissions are paid, regardless of whether those policies or practices were reduced to writing upon hiring. Under the majority's approach, these considerations are meaningless if not fully set out in the parties' agreement. The procuring-cause doctrine

construed against its drafter plays no role 'in making a fact finding about what the parties intended.'" (quoting *GTE Mobilnet of S. Tex. Ltd. P'ship v. Telecell Cellular, Inc.*, 955 S.W.2d 286, 291 (Tex. App.—Houston [1st Dist.] 1997, writ denied))).

[3] 185 S.W. 295, 296 (Tex. 1916) (noting that for a real estate broker to earn a commission, "a purchaser must have been produced through his efforts, ready, able and willing to buy the property upon the contract terms").

[4] 250 S.W. 151, 152 (Tex. Comm'n App. 1923) (stating "when a real estate broker is instrumental in bringing together the seller and a purchaser who is acceptable to him, and they consummate a sale," the agent is "the procuring cause of the sale" and "is entitled to the commission agreed upon").

trumps them. This is, in my view, a significant and ill-advised departure from both the at-will employment doctrine and the notion that Texas courts should enforce and not rewrite the terms of the parties' bargain.

My view that the procuring-cause doctrine is a misfit in the at-will employment context is borne out by Texas authorities in two respects. First, there are few Texas cases applying the doctrine in the last century, and courts that have applied it usually have done so in the context of real-estate brokers who were engaged on a one-time basis to sell a single piece of real property.[5] By contrast, courts adjudicating commissions of employees do not apply the procuring-cause doctrine but instead follow our established methodology in which the factfinder considers extrinsic evidence to discern the meaning of ambiguous commission agreements.[6]

Second, the Texas Workforce Commission, which adjudicates approximately 20,000 wage claims per year,[7] does not employ the

---

[5] *See, e.g.*, *Frady v. May*, 23 S.W.3d 558, 565 (Tex. App.—Fort Worth 2000, pet. denied); *Ramesh v. Johnson*, 681 S.W.2d 256, 259 (Tex. App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.).

[6] *See, e.g.*, *Tex-Fin, Inc. v. Ducharne*, 492 S.W.3d 430, 443–44 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (considering extrinsic evidence to determine that substantial evidence supported the trial court's reversal of TWC's rejection of a salesperson's claim for post-termination compensation under a bonus/commission agreement); *Vassar Grp., Inc. v. Ko*, No. 05-18-00814-CV, 2019 WL 3759467, at *5 (Tex. App.—Dallas Aug. 9, 2019, no pet.) (concluding an employment agreement where the parties had "differing theories as to when a commission is 'earned' and payable post termination" was "susceptible to at least two reasonable interpretations" and therefore "ambiguous, creating a fact issue on the parties' intent").

[7] *Igal v. Brightstar Info. Tech. Grp., Inc.*, 250 S.W.3d 78, 82 (Tex. 2008) ("According to TWC, it receives approximately 20,000 wage claims per year for initial decision . . . .").

procuring-cause doctrine. Instead, TWC rules reflect that, unless otherwise agreed, an employer must pay commissions "earned as of the time of separation."[8] Thus, to the extent TWC's rules can be said to articulate a default rule, it is not the procuring-cause doctrine. It is that the end of the at-will relationship is the line of demarcation by which commissions, if they will ever be owed, must be earned and identifiable. In TWC's view, commissions do not become payable—i.e., can no longer be earned—*after* separation.

TWC rules also contemplate that the agreement made when the employee was first hired may not address all the particulars and that a determination of commissions due post-termination should consider "*any* special agreement" made upon separation.[9] This use of "any" signals that TWC would consider agreements that elucidate the terms of an earlier agreement, whether the agreement made upon separation is express or implicit, written or oral, industry-specific or not.

### III

Here, BMGL offered Perthuis a position as its Vice President of Sales and Marketing in a two-page offer letter. As the court of appeals noted, the terms relating to commission are "sparse." 639 S.W.3d 108, 114 (Tex. App.—Houston [1st Dist.] 2020). The contract stated:

> Your annual base salary at the time of close will be $133,000. Provided the transaction has closed, your annual base salary will be $145,000 effective April 1, 2015. *Your commission will be 3.5% of your net sales.* You will also be eligible to participate in the BMGL [long-term

---

[8] 40 TEX. ADMIN. CODE § 821.26(b).

[9] *Id.* § 821.26(c) (emphasis added).

8

incentive] plan effective April 1, 2015 with an LTI target of 40% of your annual base salary with BMGL. . . . In addition, you will be eligible to receive a retention bonus. [Emphasis added.]

The offer letter did not elaborate on the commission structure beyond the statement that Perthuis would be paid 3.5 percent of "your net sales." It did state that Perthuis's employment would be "at-will" and that he would be entitled to various employment benefits, including medical, dental, and life insurance, as well as a sponsored 401(k) plan.

Perthuis contends that the agreement entitles him to commissions on post-termination sales, while BMGL says it does not. The logical starting point, then, is to ask whether the agreement granting Perthuis a 3.5 percent commission on "your net sales" definitively answers that question. If its language unambiguously shows that Perthuis is (or isn't) entitled to commissions on sales after his termination, then we construe the contract as a matter of law. *See El Paso Field Servs.*, 389 S.W.3d at 806. But if Perthuis and BMGL have both proffered reasonable interpretations of the provision in question, then the agreement is ambiguous and the trial court should have tasked the jury with determining its meaning.

Neither party in this case pleaded ambiguity. Instead, each argued that the agreement's text unambiguously supported their respective interpretations. The thrust of Perthuis's argument was that a commission is compensation for sales procured and thus the employment agreement's promise to pay him a 3.5 percent commission on "[his] net sales" entitles him to the sales he procured under the Natera deal and others, including those that postdate his departure.

9

Perthuis also pointed out that the employment agreement did not contain any limiting language conditioning commission payments on continued employment with BMGL.[10]

BMGL, on the other hand, maintains the contract unambiguously does *not* entitle Perthuis to commissions on post-termination sales. It urges us to interpret the commission obligation in light of the employment agreement in its entirety.[11] BMGL notes Perthuis conceded at trial that the other benefits outlined in his employment agreement, including salary, health insurance, and the 401(k) contribution, ended the moment BMGL terminated his at-will employment, even when the contract did not say so explicitly. The commission provision, BMGL argues, should be interpreted the same way: once Perthuis's employment ended, BMGL's obligation to pay commissions on any sales ceased. And because Natera sales did not occur during the term of employment, Perthuis's termination preceded the "commission-earning event." The court of appeals agreed with BMGL's interpretation, concluding "the plain language of the

---

[10] *Cf. JCB, Inc. v. Horsburgh & Scott Co.*, No. 6:16-CV-146-RP, 2017 WL 6805045, at *3 (W.D. Tex. Oct. 25, 2017) (rejecting argument that plaintiff was entitled to commissions on post-termination sales because the agreement specified that commissions would be earned only "on sales from orders received by the Company *on or before the effective date of termination*" (emphasis added)), *vacated in part on other grounds*, 941 F.3d 144 (5th Cir. 2019).

[11] *See Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005) (stating we interpret contractual provisions "with reference to the whole agreement" and "bearing in mind the particular business activity sought to be served" (quoting *Reilly v. Rangers Mgmt., Inc.,* 727 S.W.2d 527, 530 (Tex. 1987))).

commission agreement indicates that it was intended as compensation for Perthuis's continued employment with BMGL." 639 S.W.3d at 115.

The trial court could have found the provision ambiguous and submitted it to the jury even if neither party pleaded ambiguity. *See Kelley*, 284 S.W.3d at 808. Both parties contemplated such a finding. Indeed, Perthuis's counsel discussed this possibility with the trial court at the pretrial conference:

> If you're arguing different meanings, then . . . *the Court is supposed to determine, is it ambigu[ous] or not.* [Emphasis added.]

And at the charge conference, BMGL argued the procuring-cause doctrine should not have been submitted and alternatively asked the trial court to submit the meaning of "Your commission will be 3.5% of your net sales" to the jury, drawing the proposed question from Texas PJC 101.8 on ambiguous contracts. By submitting the procuring-cause doctrine—and decoupling at-will employment with BMGL from Perthuis's entitlement to commissions—the trial court leapfrogged the central contractual dispute in the case: did the parties intend Perthuis to earn commissions only on sales completed while he was employed with BMGL? Or on sales to customers he procured while employed by BMGL, for so long as they remained customers of BMGL? For a year following his separation? Or something else? Under the procuring-cause doctrine, it doesn't matter. No one need bother with what the parties intended and thought they had agreed.

I would hold that both parties proffered reasonable interpretations of the commission provision and thus it is ambiguous with respect to whether Perthuis is entitled to commissions on post-

11

termination sales.[12]  The agreement states that "Your commission will be 3.5% of your net sales."  It provides no guidance on the meaning of "commission" on "*your* net sales," and it is not clear when a sale becomes *Perthuis's* sale such that he earns a commission.  One possibility—the theory Perthuis advances—is that "your net sales" encompasses all sales Perthuis "set in motion" or had some hand in procuring, even if they were not placed, invoiced, or paid for until after BMGL terminated him. *Ante at* 22.  But it is also reasonable to interpret the commission provision as entitling Perthuis to commissions only on "net sales" finalized (i.e., sales for which an order had been placed, invoice had been sent, or payment had been received) during the term of his employment.

In short, both sides advance contract-interpretation arguments that are reasonable.  I would thus hold the commission provision ambiguous and remand for a new trial in which a jury would determine whether, considering the extrinsic evidence, the parties intended that BMGL would pay Perthuis commissions on post-termination sales.[13]

---

[12] *See Vassar Grp., Inc.*, 2019 WL 3759467, at *5 (finding ambiguous an employment agreement where the parties had "differing theories as to when a commission is 'earned' and payable post termination").

[13] This approach would, of course, require a jury to determine the meaning of the ambiguous contract, but the majority's approach yields the same result: a jury trial in every case in which the procuring-cause doctrine applies.  *Ante* at 11 (noting that the procuring-cause doctrine "fully respects the factfinder's authority and obligation to determine *whether* the broker's action produced the purchaser, which generally is 'purely a question of fact'" (quoting *Goodwin*, 185 S.W. at 297)).  Under my approach, the jury would resolve the meaning of a contract term, a fairly discrete task.  Under the majority's, the jury will have to determine for which individual sales—out of potentially hundreds or thousands—a salesperson was the "procuring cause," a far more amorphous and potentially cumbersome task.

*See Barrow-Shaver*, 590 S.W.3d at 480 ("When a court determines that a contract is ambiguous, the meaning becomes a fact issue for the jury and extraneous evidence may be admitted to help determine the language's meaning.").

\* \* \*

The parties had many drafting options at their disposal. BMGL could have obtained its desired outcome by specifying in the agreement that Perthuis was entitled to commissions only on sales orders received while Perthuis was employed by BMGL. By the same token, Perthuis, a sophisticated sales executive, could have bargained for a tail provision, under which he would continue to be paid commissions for an agreed-upon period of time post-termination for sales to customers he procured during the term of his employment.[14] Skilled practitioners could no doubt think of countless other mechanisms by which to unambiguously specify the "sales" for which a salesperson is owed commission. And Texas courts would enforce any such provisions to the letter, all toward the end of effectuating precisely the deal the parties struck.

The problem with the majority's approach today is that it abandons the worthy goal of effectuating parties' intended meaning whenever a human drafter falls short of describing the agreement with perfect precision. In that case, says the majority, all bets are off: we dispense with the work of ascertaining and enforcing the agreement's

---

[14] *See, e.g.*, *Indus. III, Inc. v. Burns*, No. 14-13-00386-CV, 2014 WL 4202495, at \*12 (Tex. App.—Houston [14th Dist.] Aug. 26, 2014, pet. denied) (rejecting plaintiff's claim that it was entitled to a fee for introducing the parties to a transaction because the transaction closed after the six-month tail lapsed).

13

true meaning, and instead apply the procuring-cause doctrine, regardless of whether it has any relation to what *these* parties intended *their* contract to mean.[15]  Because I cannot bless this methodological shortcut, I respectfully dissent.

Rebeca A. Huddle
Justice

**OPINION DELIVERED:** May 20, 2022

---

[15] The majority emphasizes that the procuring-cause doctrine contributes to the "[s]tability and predictability of contract law." *Ante* at 11. While those are worthy goals, we have also recently held that predictability through the use of mechanical default rules sometimes must yield to an intent-focused inquiry. *See Wenske v. Ealy*, 521 S.W.3d 791, 792 (Tex. 2017) (discouraging reliance on "default or arbitrary rules" and "reaffirming the paramount importance of ascertaining and effectuating the parties' intent"); *Hysaw v. Dawkins*, 483 S.W.3d 1, 4 (Tex. 2016) ("Though we acknowledge the call for more certain and predictable guidance, we reject bright-line rules of interpretation that are arbitrary and, thus, inimical to an intent-focused inquiry.").