

# NUMBER 13-23-00230-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

BBVA USA,                                                                          Appellant,

v.

TAYLOR CORYNN CAREY,
TERRENCE MACDONALD CAREY,
AND MORGAN LEIGH CAREY,                                        Appellees.

## ON APPEAL FROM THE 404TH DISTRICT COURT
## OF CAMERON COUNTY, TEXAS

## MEMORANDUM OPINION

**Before Chief Justice Tijerina and Justices Peña and Cron[1]
Memorandum Opinion by Chief Justice Tijerina**

Appellant PNC Bank, N.A. (BBVA), as successor in interest to BBVA USA, appeals

---

[1] The Honorable Nora L. Longoria, former Justice of this Court, did not participate in this opinion because her term of office expired on December 31, 2024. In accordance with the appellate rules, she was replaced on panel by Justice Jenny Cron.

the trial court's summary judgment in favor of appellees Taylor Corynn Carey, Terrence Macdonald Carey, and Morgan Leigh Carey (the Careys). By what we construe as five issues, BBVA contends that the trial court improperly granted the Careys' traditional motion for summary judgment and improperly denied BBVA's traditional motion for summary judgment. We affirm.

## I. BACKGROUND

The Careys own a condominium unit in fee simple located on South Padre Island, Texas (the Property), and they executed a lease on the Property on June 25, 1976, which ends on December 31, 2046. On December 22, 2008, Patricia Edith Ariat Infante (the Tenant) "purchased the leasehold interest in the Property pursuant to an Assignment of Leasehold interest with Vendor's Lien, a note, and a deed of trust" (the Lease). The Tenant financed her purchase of the leasehold estate with a mortgage from BBVA.

In 2018, the Tenant did not pay the Lease payments and the ad valorem taxes for the Property. On March 29, 2019, the Careys sent a letter (the Default Notice) to the Tenant and BBVA asking the Tenant to pay the lease amount of $2,043.34 by April 30, 2019, or else the Lease would terminate. The Default Notice informed BBVA that, as the mortgagee of the Property, it had ninety days to cure the Tenant's default. It is undisputed that BBVA received the Default Notice on April 2, 2019, and did not cure the Tenant's default.

The Tenant failed to make the required payment, and the Careys sent an eviction notice to her on May 1, 2019, indicating that the Tenant's right of possession was terminated and demanding that she vacate the Property. The Careys sent a copy of the

2

eviction notice to BBVA. On May 2, 2019, the Careys, via W.R. Carey Corporation, sent BBVA a notice of default and termination of right of possession (the Advanced Termination Notice) reiterating that the Careys had notified BBVA that the Tenant had defaulted, it had ninety days from the date of the Default Notice sent on March 29, 2019, to cure the default, and BBVA's interest in the Property would terminate if it did not timely cure the Tenant's default.

On May 7, 2019, without curing the Tenant's default, BBVA filed a suit for foreclosure against the Tenant and obtained a judgment for possession on June 18, 2019. BBVA took possession of the Property on July 1, 2019. BBVA then paid $48,990.69 in past due taxes on the Property. On August 2, 2019, the Careys sent BBVA a notice of eviction (the Lender Eviction Notice), which notified BBVA that BBVA's right in the Property was terminated because it failed to cure the Tenant's default within sixty days of the Advanced Termination Notice and asked BBVA to vacate the Property or the Careys would file a suit against BBVA. The Careys changed the locks on August 11, 2019.

On September 20, 2019, BBVA sent the Careys a letter demanding possession of the Property, asserting it did not dispute the validity of the Lease, and offering to pay the past-due amounts owed on the Lease beginning from July 1, 2019, the date BBVA claims it took possession of the Property. On October 21, 2019, the Careys informed BBVA that the leasehold interest in the Property had terminated because BBVA had not cured the Tenant's default within the prescribed time under the Lease. The Careys have had continuous possession of the Property thereafter.

On November 13, 2019, BBVA filed an original petition against the Careys for

breach of contract, reentry, unlawful lockout, and for a declaratory judgment. BBVA sued on the alternative theory of equitable subrogation. On January 3, 2022, BBVA filed a traditional motion for summary judgment arguing that it was entitled to summary judgment for breach of contract because: (1) the Lease was a valid and enforceable contract; (2) BBVA is a third-party beneficiary to the contract; (3) the Careys breached the Lease by (a) not "providing at least 90 days' notice before terminating the Lease"; (b) "terminating the Lease before [BBVA] had obtained title and possession to the Property"; (c) "demanding payments for periods before [BBVA] obtained title and possession to the Property,[;] and [(d)] wrongfully excluding [BBVA] from the Property"; and (4) the Careys's breach caused BBVA injury, "specifically identified as a loss of the value of the Property, in the amount of $163,848.76." BBVA claimed it was entitled to traditional summary judgment on its claim "for reentry because the undisputed facts . . . establish that [the Careys] violated Texas Property Code [§] 92.0081." BBVA sought traditional summary judgment on its unlawful lockout claim on the basis that the Careys "intentionally [and unlawfully] locked [BBVA] out of the Property" because (1) BBVA "did not owe . . . any past due rent[,] . . . (2) the Lease does not give [the Careys] the right to lock [BBVA] out for nonpayment of rent," and (3) the Careys "did not provide [BBVA] with adequate notice before the lockout under" § 92.0081 of the property code.

Next, BBVA claimed that it was entitled to traditional summary judgment on its request for a declaratory judgment. BBVA said the following:

All facts and allegations set forth above are included herein for all purposes.

4

[BBVA] also brought this action under the Uniform Declaratory Judgments Act.

> Under Chapter 37.004(a) of the Texas Civil Practices and Remedies Code, a party under a written contract or whose rights are affected by a contract, "may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration or rights, status, or other legal relations thereunder."

> A justiciable controversy exists since [BBVA] asserts that it is entitled to possession of the Property under the Lease and seeks a determination from the Court of the amount owed under the Lease from the time it acquired title and possession to the Property until the time it was unlawfully locked out of the Property and that it is in fact entitled to possession of the Property.

> The matter is ripe since [the Careys] have unlawfully taken possession of the Property from [BBVA].

Finally, as to its entitlement to traditional summary judgment on its claim for alternative relief, BBVA stated the following: "In the alternative, if the Court denies any part of [BBVA's] motion for summary judgment, [BBVA] asks the Court to sign an order specifying the facts that are established as a matter of law and directing any further proceedings as are just."

On March 28, 2022, the Careys filed a counter-petition for declaratory judgment "granting them sole and exclusive title to the Property . . . free and clear from all encumbrances, including, any claim of title or right to possession by" BBVA. On March 29, 2022, the Careys filed a motion for traditional summary judgment. Specifically, the Careys claimed that the "Tenant's default could [have been] cured by the payment of money, [and the Careys] had no obligation" pursuant to Section 14 of the Lease "to extend the ninety (90) day deadline for [BBVA] to cure [the] Tenant[']s default so that [BBVA] could foreclose and sell the [L]ease hold interest in the Property or obtain possession of

5

the Property." The Careys stated, "Here, [BBVA] could have cured [the] Tenant[']s default with the payment of money. Had [BBVA] tendered [$2,043.34] to [the Careys] shortly after receiving the [Default Letter], there would have been no need for the instant case." Thus, according to the Careys, they had provided the Lease's required ninety-day notice to BBVA to cure the Tenant's default, and BBVA failed to do so within the ninety days allotted. Therefore, the Careys argued that pursuant to the Lease, they "were permitted to evict [BBVA] as of June 27, 2019," and did not send "a notice of eviction until August 2, 2019," which is "over 120 days after the ninety days began to run."

The Careys asserted that BBVA's claim that it had not taken possession of the Property when they sent the Default Letter and was therefore not required to cure the Tenant's default was without merit "because the Lease only required the extension of time for a mortgagee to perform the obligation of a defaulting Tenant through a foreclosure for obligations that are not the payment of money." The Careys said, "Accordingly, [they] were not required to wait for [BBVA] to foreclose and/or obtain possession of the Property before [they] could evict [BBVA] for failing to timely cure Tenants' default" as "[t]he Lease clearly states that extensions of time for mortgagee to foreclose and perform a tenant's obligation do not extend to obligations that [can] be cured by paying money." The Careys averred that they complied with the terms of the Lease, and therefore, BBVA's rights to the Property had "been terminated pursuant to the terms of the Lease, and a declaratory judgment should be entered setting aside [BBVA's]" case. The Careys also alleged they were entitled to summary judgment for their "claim of declaratory judgment, [and] request[ed] an order granting them sole and exclusive title to the Property free and clear

6

of any encumbrances including . . . any claim of ownership or right of possession by [BBVA]."

BBVA filed a response to the Careys' motion for traditional summary judgment objecting to some of the Careys' summary judgment evidence and stating that the Careys "failed to establish" that W.R. Carey Corporation had authority to send BBVA the Default Letter on behalf of the Careys. Specifically, BBVA explained that "[a]ttorney C. Frank Wood sent the [Default Letter] stating that his law firm had 'been retained to represent the interest of W.R. Carey Corporation,'"; however, the Careys were the landlords under the Lease not W.R. Carey Corporation, and the Careys "failed to offer any competent summary-judgment evidence that W.R. Carey Corporation had actual or apparent authority to act on their behalf." BBVA alleged that the Default Letter was confusing because it stated that Wood's law firm "had 'been retained to represent the interests of W.R. Carey Corporation, the Landlord of the'" Property. BBVA argued that the Careys "were the only Landlords under the Lease and W.R. Carey Corporation was without authority to send demand letters or terminate the Lease," and "[a]t minimum, a fact issue remains if W.R. Carey Corporation had authority to act on behalf of" the Careys.

BBVA further argued in its response that nonetheless, the Default Letter stated, "[T]he Lease terminated thirty (30) days from March 29[th], not the ninety (90) days as required under the Lease." BBVA also argued that it was not liable for the Tenant's past due amounts, and the Advanced Termination Notice, the Careys sent on May 2, 2019, "purporting to give sixty (60) days to cure the default still only included amounts owed prior to" BBVA's acquisition of title and possession to the Property. BBVA explained that

7

the Careys' argument that the Default Letter and the Advanced Termination Notice, read together, provided BBVA with ninety days to cure the Tenant's default, was without merit because "as of June 27, 2019, [BBVA] did not owe under the Lease for any amounts prior to it obtaining title to the Property on May 7, 2019." Thus, according to BBVA, the Careys' termination and taking possession of the Property "due to an alleged prior default was unlawful and without contractual authority," and "[t]his is true whether the Lease was terminated on April 30, 2019[,] pursuant to the [Default Letter] or June 27, 2019 . . . ," which in essence terminated "the Lease for a default that occurred prior to" BBVA's acquisition of title and possession of the Property.

BBVA also filed a "Reply in Support of its Traditional Motion for Summary Judgment" stating that the Careys failed to show that W.R. Carey Corporation had any authority to send the Default Letter as the Careys were the lawful landlords of the Property, and "W.R. Carey Corporation is not registered with the Texas Secretary of State and thus not authorized to do business in Texas." BBVA reiterated that nonetheless, it was not required to pay for anything prior to its acquiring title and possession of the Property, and because BBVA did not acquire title until May 7, 2019, and possession on June 18, 2019, "it was not liable for the past due **2018** amounts forming the basis for termination of the Lease by" the Careys.

On April 27, 2022, the trial court denied BBVA's motion for traditional summary judgment. On May 1, 2022, the trial court granted summary judgment in favor of the Careys and declared that the Careys "are solely and exclusively GRANTED possession of the [Property] . . . free and clear from all encumbrances, including, any claim of

8

ownership or right to possession of [BBVA]." The trial court denied BBVA possession of the Property and declared that BBVA has "no right, title, or interest in and to the Property, whether legal, equitable or otherwise." This appeal followed.

## II. APPLICABLE LAW AND STANDARD OF REVIEW

A plaintiff moving for traditional summary judgment must conclusively establish that no genuine issue of material fact exists and that as a matter of law he is entitled to summary judgment on his claim. TEX. R. CIV. P. 166a(c); *Brown v. Hearthwood II Owners Ass'n,* 201 S.W.3d 153, 159 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) (citing *Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 425 (Tex. 1997)). A defendant seeking a traditional summary judgment must either disprove at least one element of each of the plaintiff's causes of action or plead and conclusively establish each essential element of an affirmative defense. *Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex. 1995) (per curiam); *Sanchez v. Matagorda County*, 124 S.W.3d 350, 352 (Tex. App.—Corpus Christi–Edinburg 2003, no pet.). In either instance, the burden then shifts to the nonmovant to raise a genuine issue of material fact. *Zavala v. Franco*, 622 S.W.3d 612, 618 (Tex. App.—El Paso 2021, pet. denied); *Amedisys, Inc. v. Kingwood Home Health Care, LLC*, 437 S.W.3d 507, 511 (Tex. 2014).

A matter is conclusively established if reasonable people could not differ as to the conclusion to be drawn from the evidence. *Franks v. Roades*, 310 S.W.3d 615, 621 (Tex. App.—Corpus Christi–Edinburg 2010, no pet.) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex. 2005)). Evidence favorable to the nonmovant will be taken as true in deciding whether there is a disputed issue of material fact. *Fort Worth Osteopathic Hosp.,*

9

*Inc. v. Reese*, 148 S.W.3d 94, 99 (Tex. 2004); *Tranter v. Duemling*, 129 S.W.3d 257, 260 (Tex. App.—El Paso 2004, no pet.). All reasonable inferences, including any doubts, must be resolved in favor of the nonmovant. *Fort Worth Osteopathic Hosp.*, 148 S.W.3d at 99. A genuine issue of material fact exists if there is more than a scintilla of evidence regarding the challenged element. *Neely v. Wilson*, 418 S.W.3d 52, 59 (Tex. 2013).

We review the trial court's granting and denial of a traditional motion for summary judgment de novo. *Franks*, 310 S.W.3d at 620 (first citing *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003); and then citing *Branton v. Wood*, 100 S.W.3d 645, 646 (Tex. App.—Corpus Christi–Edinburg 2003, no pet.)). "On cross-motions for summary judgment, each party bears the burden of establishing that it is entitled to judgment as a matter of law." *Farmers Group, Inc. v. Geter*, 620 S.W.3d 702, 708 (Tex. 2021) (citing *City of Garland v. Dall. Morning News*, 22 S.W.3d 351, 356 (Tex. 2000) (plurality op.)). "When the trial court grants one motion and denies the other, the reviewing court must determine all questions presented and render the judgment that the trial court should have rendered." *Id.*

### III. CAPACITY

By its first issue, BBVA claims that the Careys were not entitled to traditional summary judgment because W.R. Carey Corporation lacked capacity to send any notices on behalf of the Careys. Specifically, BBVA asserts that the Lease provides that the letters sent by "the law firm of Sanchez, Whittington & Wood, LLC" to BBVA did not reference the Careys who were "the landlords under the Lease." BBVA states:

> [The Careys] failed to offer any competent summary judgment evidence that

10

W.R. Carey Corporation had authority [to] terminate the Lease, or to act in any capacity on behalf of [the Careys], the actual landlords under the Lease. W.R. Carey Corporation is not registered with the Texas Secretary of State, and thus not authorized to do business in Texas. This defect in the termination notices [was] pointed out in [BBVA's] motion for summary judgment, [BBVA's] response to [the Careys's] motion for summary judgment on their counterclaim, [BBVA's] brief in support of its motion for summary judgment, as well as at the hearing on the motion for summary judgment.

BBVA does not cite any pertinent authority or provide legal analysis supporting its assertion that the trial court improperly granted traditional summary judgment to the Careys on the basis that the Careys failed to provide competent summary judgment evidence that W.R. Carey Corporation had authority to terminate the Lease or to act in any capacity on the Careys's behalf. *See* TEX. R. APP. P. 38.1(i); *Katy Springs & Mfg., Inc. v. Favalora*, 476 S.W.3d 579, 607 (Tex. App.—Houston [14th Dist.] 2015, pet. denied) ("It is not this court's duty to review the record, research the law, and then fashion a legal argument for appellant when [it] has failed to do so."). BBVA does not cite any law regarding capacity or otherwise to support this argument. *See* TEX. R. APP. P. 38.1(i); *Harvel v. Tex. Dep't of Ins.-Div. of Workers' Comp.*, 511 S.W.3d 248, 253 (Tex. App.—Corpus Christi–Edinburg 2015, pet. denied) ("An issue on appeal unsupported by argument or citation to any legal authority presents nothing for the court to review."); *Valadez v. Avitia*, 238 S.W.3d 843, 845 (Tex. App.—El Paso 2007, no pet.) ("Failure to cite legal authority or provide substantive analysis of the legal issue presented results in waiver of the complaint."). Accordingly, we are not able to reverse the trial court's judgment in this regard. *See* TEX. R. APP. P. 38.1(i). We therefore overrule BBVA's first issue because it is inadequately briefed.

11

## IV. NINETY-DAY NOTICE

By its second issue, BBVA contends that the Careys were not entitled to traditional summary judgment because they failed to identify the date of the Tenant's default. BBVA argues, "At no point in the trial court proceeding, despite being pointed out by [BBVA], did [the Careys] state the actual date they allegedly terminated the Lease." BBVA then alleges that if the Lease terminated on April 30, 2019, the summary judgment evidence shows that the March 29, 2019 Demand for Payment "is fatally defective" because the "March 29, 2019 Demand for Payment" only gave BBVA thirty-one days' notice and not ninety days as required by the Lease. BBVA states,

> The 31-day notice with automatic termination of the Lease as provided by this Demand for Payment is a clear violation of the explicit requirement that 90-days be provided before extinguishment could occur. Counsel for [the Careys], who handled the attempted termination of the Lease, seems to have confirmed that the Lease was terminated prior to the expiration of 90 days when he stated that "the May 7, 2019 foreclosure of [BBVA]'s lien was a foreclosure of a leasehold interest in the Unit that had already been terminated[.]" However, and pursuant to the terms of the Lease, the soonest the Lease could have been terminated after the Demand for Payment would have been June 27, 2019.

This is the extent of BBVA's argument. Without more, we are unable to reverse the trial court's summary judgment on this basis. *See* TEX. R. APP. P. 38.1(i); *Harvel*, 511 S.W.3d at 253; *Valadez*, 238 S.W.3d at 845. BBVA merely makes bald assertions that are not supported with authority or legal argument. *See* TEX. R. APP. P. 38.1(i); *Harvel*, 511 S.W.3d at 253; *Valadez*, 238 S.W.3d at 845. We are not allowed to conduct legal research or make arguments for the appellant, and we decline to do so. *Bolling v. Farmers Branch Indep. Sch. Dist.*, 315 S.W.3d 893, 895 (Tex. App.—Dallas 2010, no pet.) ("We

12

are not responsible for doing the legal research that might support a party's contentions. . . . Were we to do so, . . . we would be abandoning our role as judges and become an advocate for that party."). Moreover, the Default Notice states that BBVA had ninety days to cure the Tenant's default.

BBVA then argues that the Lease could not have been terminated on or after June 27, 2019, because "[t]he Lease itself allows for no . . . distinction between termination of the Lease as to the Tenant versus a lienholder such as" BBVA. Thus, as we understand the argument, BBVA believes that the Lease terminated as to BBVA on the same date that the Tenant lost possession of the Property. BBVA acknowledges that the Careys sent more than one default letter and gave it more time to cure the default, but without citation to authority or legal analysis, it maintains that the time provided by the Careys cannot be construed together to satisfy the Lease's ninety-day notice requirement. *See* TEX. R. APP. P. 38.1(i).

BBVA generally cites *In re Cunningham*, No. 05-32951-SGJ-13, 2008 WL 1696756, at *1 (Bankr. N.D. Tex. Apr. 9, 2008). However, BBVA fails to provide any legal analysis of this case, which pertains to a homestead wherein the court analyzed Texas Property Code § 51.002 or to explain how this case applies to the facts here. *See* TEX. R. APP. P. 38.1(i); *Harvel*, 511 S.W.3d at 253; *Valadez*, 238 S.W.3d at 845. We are not allowed to make arguments for the appellant, and we would be required to guess as to how BBVA believes this case applies to the facts here. *See Bolling*, 315 S.W.3d at 895. We decline to do so. *See id.* Moreover, once the Careys established their entitlement to summary judgment, the burden shifted to BBVA to raise an issue of material fact on one

essential element of the Careys' claim or on each element of its affirmative defense. *Lujan v. Navistar Fin. Corp.*, 433 S.W.3d 699, 706 (Tex. App.—Houston [1st Dist.] 2014, no pet.) Here, in its response to the Careys's motion for summary judgment, BBVA did not mention § 51.002 or argue that it applied as an affirmative defense or prohibited the trial court from granting summary judgment because it raised an issue of material fact on one essential element of the Careys' claim. *Id.* at 704 (providing that a nonmovant wishing to defeat summary judgment by raising an affirmative defense, "must do more than just plead the affirmative defense" and "must come forward with evidence sufficient to raise a genuine issue of material fact on each element of his affirmative defense"); *Shih v. Tamisiea*, 306 S.W.3d 939, 944 (Tex. App.—Dallas 2010, no pet.) ("[Although a] nonmovant need not answer or respond to a motion for summary judgment to contend on appeal that the grounds expressly presented by the movant's motion are insufficient as a matter of law to support summary judgment . . . "the nonmovant must expressly present to the trial court in a written answer or response to the motion any reason for avoiding the movant's entitlement to summary judgment."). Thus, we are not able to reverse on this basis. *See id.* We overrule BBVA's second issue.

## V.     CONSTRUCTION OF THE LEASE

By its third issue, BBVA claims that the Careys were not entitled to traditional summary judgment because the Lease did not require BBVA to cure the Tenant's default. Specifically, BBVA claims that it was not responsible for any charges that were incurred prior to the period that it had possession and ownership of the Property, which occurred on May 7, 2019, after the foreclosure sale. BBVA argues as follows:

14

Thus, as of June 27, 2019, there was no default and [the Careys] had no right to terminate the Lease since the past due amount owed by [BBVA] would have been $0.00. Of course, any amounts past due would still be owed to [the Careys] by the [Tenant], but [BBVA] had no obligation to pay them under the Lease. At a minimum, there was no evidence to support a finding by the trial court that the Lease was in default as of June 27, 2019, which would be necessary for [the Careys] to be authorized to terminate the Lease.

This type of provision subordinating minor amounts past due is standard in homeowner association declarations and other similar type of lease arrangements in which third party lenders finance the acquisition. The reason is simple; it encourages lenders to provide funding for the purchase of these type of leasehold estates, which ultimately benefits the landlords. Otherwise, potential purchasers would lack the financial means to acquire leasehold estates if lenders such as [BBVA], could have its $121,875.00 purchase money deed of trust wiped out by $1,526.00 in past due fees owed to a third party for which the lender has no authority or control over.

Section 14 of the Lease states, "During the continuance in effect of any first mortgage of this lease . . . Landlord will not terminate this lease because of any default on the part of the Tenant to observe or perform any of the covenants or conditions herein contained if" the Landlord provides the mortgagee notice that the Landlord intends to terminate the Tenant's leasehold interest due to the Tenant's default, and if "within ninety (90) days," the mortgagee cures "such default if the same can be cured by the payment of money . . . until such time as [the L]ease shall be sold upon foreclosure of such mortgage." Section 14 continues:

In case of such undertaking, Landlord will not so terminate within such further time as may be required by the mortgagee to complete foreclosure of such mortgage or other remedy thereunder, provided (a) that such remedy is pursued promptly and completed with due diligence, and (b) *that all rent and other charges accruing here under are paid as the same become due*; and upon foreclosure sale of this lease the time for performance of any obligation of Tenant then in default hereunder, other than payment of money, shall be extended by the time reasonably

15

necessary to complete such performance by due diligence.

(Emphasis added).

BBVA places a great importance on what it labels the date the Lease was terminated. It appears that BBVA believes that the Careys terminated its interest in the Lease on the same date it terminated the Tenant's interest. However, BBVA points to nothing in the Lease that we can construe as terminating a mortgagee's rights under the Lease when a Tenant's interest in the Lease has been terminated. Instead, the Lease explicitly provides that BBVA's interest in the Lease continue for ninety days after receiving notice of the Tenant's default. Thus, BBVA has failed to show that the date the Careys terminated the Tenant's interest in the Lease matters.

Pursuant to section 14 of the Lease, BBVA could have avoided termination of the Lease if after the Careys sent the Default Notice, BBVA cured the Tenant's default within ninety days of the notice. BBVA argues that the Default Notice merely provided BBVA thirty-one days to cure the Tenant's default. This claim is belied by the Default Notice. Although the Default Notice states that the Tenant had thirty days to cure the defect, it provides that BBVA had ninety days to cure the Tenant's default before the Careys would terminate BBVA's interest in the Lease. It is undisputed that BBVA received the Default Notice on April 2, 2019, and that the Tenant's default could have been cured by payment of money under section 14 of the Lease. The Careys then sent the Advanced Termination Notice on May 2, 2019, explaining that BBVA had ninety days from March 29, 2019, the date of the Default Notice, to cure the Tenant's default. It is undisputed that BBVA did not do so. Thus, after ninety days passed without BBVA curing the Tenant's default, section

16

14 allowed the Careys to terminate the Lease as to BBVA.

Nonetheless, BBVA argues that pursuant to section 15 of the Lease it only had a duty to pay for any obligations imposed upon the Tenant "during the period [it had] possession or ownership of the leasehold estate," which occurred on May 7, 2019, when BBVA acquired the Lease at the foreclosure sale.

Section 15 of the Lease is titled "ASSIGNMENT" and states that

> Tenant may from time to time, without Landlord's consent, assign, mortgage or sublease this lease and any mortgagee may enforce such mortgage and acquire title to the leas[e]hold estate herein granted, and upon any foreclosure thereof by such mortgagee may sell and assign the leasehold estate; provided, however, that every assignment of this lease other than by a mortgage, shall contain the written undertaking of the assignee to perform all obligations of the Tenant hereunder and upon execution of any assignment or mortgage a true copy thereof shall be promptly delivered to Landlord. Any person acquiring the leasehold estate in consideration of the extinguishment of the debt secured by such mortgage or through foreclosure sale, judicial or otherwise, shall be liable for the obligations imposed upon the Tenant by the lease only during the period such person has possession or ownership of the leasehold estate.

Section 15 gives the Tenant the right to assign, mortgage or sublease the Lease without the Careys' consent. It provides that a mortgagee can enforce the terms of the mortgage and has the right to foreclose on the Property and resell the leasehold estate. Finally, as relevant here, section 15 states that whoever acquires the leasehold estate from the Tenant whether by sale, foreclosure, or any other way will be responsible for obligations imposed on the Tenant during that person's possession or ownership of the leasehold estate.

BBVA argues that only section 15 applies because BBVA eventually acquired possession of the leasehold in a foreclosure sale. However, nothing in section 15

17

obliterates section 14's requirement that as the mortgagee, BBVA had a duty to cure the Tenant's default within ninety days. Furthermore, section 14 explicitly states that if a mortgagee intends to retain its interest in the Property, "that all rent and other charges accruing hereunder are paid as the same become due[.]" We are required to give meaning to all provisions of a contract. *James Constr. Grp., LLC v. Westlake Chem. Corp.*, 650 S.W.3d 392, 403 (Tex. 2022) ("We construe the language of an unambiguous contract according to its plain meaning, attempting to give effect to all provisions."). "In discerning the parties' intent, 'we must examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless.'" *El Paso Field Servs, L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 805 (Tex. 2012) (first citing *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011); and then citing J*.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003)). To construe section 15 in this manner would allow BBVA to avoid the dictates of section 14 and cause section 14 to become meaningless. *See id.* We decline to construe the Lease in such a manner. *See id.*

Section 14 of the Lease clearly required BBVA as the mortgagee to cure the Tenant's default within ninety days after it received notice that the Careys intended to terminate the Tenant's interest, and it is undisputed that BBVA failed to do so.[2] Therefore, BBVA has not established that the Careys were not entitled to summary judgment on this

---

[2] Pursuant to section 15, after BBVA foreclosed and purchased the Lease, it was also "liable for the obligations imposed upon the Tenant by the lease . . . during the period" it had "possession or ownership of the leasehold estate."

18

basis. We overrule BBVA's third issue.[3]

### VI.    BBVA'S MOTION FOR TRADITIONAL SUMMARY JUDGMENT

By its fourth issue, BBVA contends that it established as a matter of law that it was entitled to traditional summary judgment on its claims for breach of contract, reentry and unlawful lockout, and declaratory judgment.

### A.    Breach of Contract

First, BBVA asserts that the Careys breached the Lease by failing to provide ninety days' notice before terminating the Lease. As previously discussed, the evidence conclusively establishes that the Careys notified BBVA that it had ninety days to cure the Tenant's default or the Lease would be terminated, and the Careys gave BBVA more than ninety days to cure the Tenant's default. Therefore, BBVA did not meet its burden of establishing that it was entitled to traditional summary judgment on its breach of contract claim on this basis. *See* TEX. R. CIV. P. 166a(c); *Brown*, 201 S.W.3d at 159. We overrule BBVA's fourth issue in this regard.

### B.    Other Claims

Next, BBVA asserts, without a legal analysis of pertinent authority or a discussion of the law as applied to the facts herein, that it was entitled to traditional summary judgment on its claims for reentry and unlawful lockout and declaratory judgment. *See* TEX. R. APP. P. 38.1(i). Without more, we are unable to reverse the denial of BBVA's

---

[3] BBVA does not challenge the trial court's granting the Careys' summary judgment on any of its other claims including subrogation. *Canton-Carter v. Baylor Coll. of Med.*, 271 S.W.3d 928, 930 (Tex. App.—Houston [14th Dist.] 2008, no pet.) ("In the review of a civil case, an appellate court has no discretion to consider an issue not raised in an appellant's brief.").

motion for traditional summary judgment on these grounds because we would have to become advocates for BBVA and are not allowed to do so. *See Bolling*, 315 S.W.3d at 895. We overrule BBVA's fourth issue in this respect.

## VII. EQUITABLE SUBROGATION

By its fifth issue, BBVA contends that the trial court should have granted its motion for traditional summary judgment on its subrogation claim because it proved as a matter of law that it is entitled to the amount it paid for the ad valorem taxes. Although in its petition BBVA sought relief pursuant to the theory of equitable subrogation, BBVA did not address this claim in its motion for traditional summary judgment. In its motion for traditional summary judgment, BBVA argued regarding "Alternative Relief" as follows: "In the alternative, if the Court denies any part of [BBVA's]motion for summary judgment, [BBVA] asks the Court to sign an order specifying the facts that are established as a matter of law and directing any further proceedings as are just. TEX. R. CIV. P. 166a (e)." Thus, BBVA did not mention its equitable subrogation claim or argue that it had met its summary judgment burden for that claim. Therefore, BBVA did not meet its summary judgment burden of establishing as a matter of law that it was entitled to traditional summary judgment on this basis. *See* TEX. R. CIV. P. 166a(c); *Brown*, 201 S.W.3d at 159.

Nonetheless, BBVA argues that it "notified the trial court of the competing claims for equitable subrogation in its brief in support of its traditional motion for summary judgment." However, to prevail on its motion for traditional summary judgment, BBVA was required to identify the specific grounds in its motion for summary judgment. *See McConnell v. Southside Indep. School Dist.*, 858 S.W.2d 337, 338, 341 (Tex. 1993)

20

(explaining that the summary judgment *motion* must identify the specific grounds for summary judgment). We overrule BBVA's fifth issue.[4]

### VIII.   CONCLUSION

We affirm the trial court's judgment.

JAIME TIJERINA
Chief Justice

Delivered and filed on the
6th day of March, 2025.

---

[4] BBVA does not challenge the trial court's denial of their motion for traditional summary judgment for its subrogation claim on any other ground.