# IN THE SUPREME COURT OF TEXAS

══════════
No. 10-0648
══════════

EL PASO FIELD SERVICES, L.P. AND
GULFTERRA SOUTH TEXAS, L.P. F/K/A/
EL PASO SOUTH TEXAS, L.P.,
PETITIONERS,

v.

MASTEC NORTH AMERICA, INC.
AND MASTEC, INC.,
RESPONDENTS

══════════════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FIRST DISTRICT OF TEXAS
══════════════════════════════════════════════════════

**Argued January 11, 2012**

JUSTICE GREEN delivered the opinion of the Court, in which CHIEF JUSTICE JEFFERSON, JUSTICE HECHT, JUSTICE JOHNSON, JUSTICE WILLETT, and JUSTICE BOYD joined.

JUSTICE GUZMAN filed a dissenting opinion, in which JUSTICE MEDINA and JUSTICE LEHRMANN joined.

In this case, we are asked to harmonize provisions in a pipeline construction contract to determine who bears the risk of obstacles in the pipeline's path. Specifically, we must examine the effect of the contract's risk-allocation provisions in light of due diligence specifications under which

the pipeline owner was purportedly required, but failed, to provide accurate and complete information to the contractor regarding the location of "foreign crossings." We conclude that the contract allocated all risk to the contractor for unknown obstacles discovered during the construction process. Accordingly, we reverse the court of appeals' judgment and reinstate the trial court's judgment.

## I. Factual Background

El Paso Field Services, L.P. purchased an eight-inch propane pipeline from Coastal Corporation. The pipeline was approximately sixty-eight miles long, and was constructed in the 1940s as an emergency war pipeline to transport petroleum from Corpus Christi to inland U.S. Air Force bases. After determining that the pipeline was too shallow to be safe, El Paso made plans to remove the old pipeline and construct a new one that would carry butane, a byproduct of natural gas. El Paso invited MasTec, Inc., a company looking to expand its business to include energy pipelines, as well as other contractors to bid on a project to replace the section of the pipeline from Victoria to Nueces Bay. MasTec had never installed a pipeline, and its primary business usually entailed installing underground fiber-optic cables and telephone lines.

Before soliciting bids for the project, El Paso hired Gullett & Associates, Inc., a survey mapping company out of Houston, to survey the pipeline route. This survey was compiled in the form of "alignment sheets," which showed the locations of 280 "foreign crossings" along the pipeline's right-of-way, including other pipelines, utilities, roads, rivers, canals, fences, wells, cables, and concrete structures. The alignment sheets were included in a bid package, which was distributed to the contractors at a pre-bid meeting to help them estimate the cost of constructing the pipeline.

2

To bid the project, MasTec hired as its general manager Bill White, who had forty-one years of experience in the pipeline construction business and had a team of construction personnel, including many who had worked with him for almost thirty years. White attended the pre-bid meeting on MasTec's behalf and received a copy of the alignment sheets, El Paso's contract, and other pertinent information for estimating the cost of the project. At the meeting, El Paso encouraged each potential bidder to perform an aerial inspection of the pipeline route. Subsequently, White and his son flew by helicopter over the route to assess its general topography, landing occasionally to assess the soil conditions. White testified that bidders were prohibited from entering certain private properties along the route, but El Paso later claimed that the contractors were able to enter those areas if they were escorted by an El Paso representative.

Shortly thereafter, White submitted, on MasTec's behalf, a completed contract and a bid on the project for $3,690,960, which was substantially lower than the other bids. The average bid for the project was $8.1 million.[1] El Paso narrowed its choices to two contractors, then met with White to ensure that MasTec would be able to complete the project according to El Paso's time frame. El Paso asserts that, at that meeting, its representatives discussed MasTec's low bid with White, and then offered White the opportunity to withdraw the bid. White disputes being told that the bid was low and denies being offered the chance to withdraw the bid. Nevertheless, El Paso subsequently awarded MasTec the contract, which the parties entered into on June 10, 2003.

---

[1] MasTec's bid of more than $3.69 million, combined with its damage award of more than $4.69 million, approximately equals the average bid amount submitted by other contractors.

MasTec's work on the project commenced later that month. Although the alignment sheets showed 280 foreign crossings, MasTec discovered far more foreign crossings by the end of the project.[2] Many of the undiscovered foreign crossings required a special weld, called a "tie-in" weld, and about ten hours of labor, which substantially increased the cost of the work. In a letter to El Paso dated September 8, 2003, White raised the issue of extra costs associated with foreign crossings, though he did not make a demand for payment. El Paso responded by letter on September 26, 2003, reciting contractual provisions and asserting that the undiscovered foreign crossings were within MasTec's scope of work.

## II. Procedural Background

In 2004, MasTec filed suit against El Paso for breach of contract and fraud, based on El Paso's failure to locate 794 unknown foreign crossings and its subsequent refusal to compensate MasTec for its additional expenses resulting from the crossings. In the alternative, MasTec sought to recover under the theories of quantum meruit and quantum valebant. At trial, the jury was asked whether El Paso failed to comply with the contract.[3] To answer that question, the jury was instructed

---

[2] The record contains conflicting accounts of the actual number of foreign crossings. Steve Edwards, who MasTec hired to locate foreign crossings, testified that he found over a thousand foreign crossings. Greg Perkins, a mechanical engineer who testified as an expert for MasTec, testified that MasTec located 794 foreign crossings and that more than 200 were metal pipelines that had not been identified on El Paso's alignment sheets. Gullett's survey supervisor, Richard Schubert, who El Paso sent out at the close of the project to confirm the number and location of additional foreign crossings, testified that there were 274 additional foreign crossings and 126 additional tie-in welds. Schubert also testified, however, that the as-built drawings Gullett prepared after MasTec completed the project showed 343 additional foreign crossings, including 208 that were metal. In this proceeding, MasTec alleges that there were 794 foreign crossings that required 217 additional tie-in welds.

[3] It appears from the record that MasTec did not pursue fraud or misrepresentation claims, nor were any tort theories submitted to the jury. Incidentally, MasTec had indicated in a letter to El Paso during the construction process that it did not believe the omissions from the alignment sheets were intentional or that El Paso withheld information from them. The letter stated, "We merely feel that circumstances beyond your control, and ours, has [sic] had a cost impact to MasTec worth reviewing." The letter then stated, in regard to the additional foreign crossings: "These were mostly

4

to consider "whether El Paso exercised due diligence in locating foreign pipelines and/or utility line crossings." The jury answered that El Paso failed to comply with the contract and awarded MasTec $4,763,890 in damages. Additionally, the jury found that MasTec failed to comply with the contract by not completing the work required in the contract and awarded El Paso $104,687.09 in damages.

El Paso moved to disregard the jury's findings and for judgment notwithstanding the verdict. El Paso urged that the "due diligence" provisions in the contract "did not involve any future performance but at best constituted a warranty." El Paso further asserted that, regardless of the due diligence provisions in the contract, MasTec disclaimed reliance on any warranty by El Paso regarding foreign pipeline and utility crossings. The trial court granted the motion and entered a take-nothing judgment in favor of El Paso, finding that the contract was clear and unambiguous and "allocates the risk of any additional cost incurred because of foreign pipeline crossings to MasTec." In response, MasTec filed a motion to vacate the judgment, which the trial court denied.

MasTec appealed, and the court of appeals reversed the trial court's judgment. 317 S.W.3d 431, 434 (Tex. App.—Houston [1st Dist.] 2010). On rehearing, the court of appeals issued a new opinion, though it did not change its disposition or judgment. *Id.* The court of appeals held that MasTec's commitments and representations under the contract did not preclude its recovery based on the jury's finding that El Paso failed to exercise due diligence in locating the foreign crossings. *Id.* at 456. The court of appeals denied El Paso's motion for rehearing en banc. *Id.* at 431. We granted El Paso's petition for review. 55 Tex. Sup. Ct. J. 29 (Oct. 21, 2011).

---

all fiberglass lines that no one had any knowledge of."

5

### III. Standard of Review

In construing a contract, we must ascertain and give effect to the parties' intentions as expressed in the writing itself. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011). In discerning the parties' intent, "we must examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *Id.* (quoting *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003)) (internal quotation marks omitted). We begin our analysis with the contract's express language. *Id.* If we determine that the contract's language can be given a certain or definite legal meaning or interpretation, then the contract is not ambiguous and we will construe it as a matter of law. *Id.* But, "if the contract is subject to two or more reasonable interpretations after applying the pertinent rules of construction, the contract is ambiguous, creating a fact issue on the parties' intent." *J.M. Davidson*, 128 S.W.3d at 229.

### IV. Contract Interpretation

El Paso relies on the following risk-allocation provisions in the lump-sum contract:

7.1 REPRESENTATIONS AND WARRANTIES

[MasTec] represents and warrants to [El Paso]:

(e) That its duly authorized representative has visited the site of the Work, is familiar with the local and special conditions under which the Work is to be performed and has correlated the on site observations with the requirements of the Contract and has fully acquainted itself with the site, including without limitation, the general topography, accessibility, soil structure, subsurface conditions, obstructions and all other conditions pertaining to the Work and has made all investigations essential to a full understanding of the difficulties which may be encountered in performing the Work, and that anything in this Contract or in any representations, statements or information made or furnished by [El Paso] or any of

6

its representatives notwithstanding, [MasTec] assumes full and complete responsibility for any such conditions pertaining to the Work, the site of the Work or its surroundings and all risks in connection therewith;

. . . .

(g) That the Contract is sufficiently complete and detailed for [MasTec] to perform the Work required to produce the results intended by the Contract and comply with all the requirements of the Contract; . . .

. . . .

## 8.1 CONTRACTOR'S CONTROL OF THE WORK

(a)(7) [MasTec] represents that it has had an opportunity to examine, and has carefully examined, all of the Contract documents and has fully acquainted itself with the Scope of Work, design, availability of materials, existing facilities, the general topography, soil structure, substructure conditions, obstructions, and all other conditions pertaining to the Work, the site of the Work and its surrounding; that it has made all investigations essential to a full understanding of the difficulties which may be encountered in performing the Work; and that anything in any of the Contract documents or in any representations, statements or information made or furnished by [El Paso] or its representatives notwithstanding, [MasTec] will regardless of any such conditions pertaining to the Work, the site of the Work or its surrounding, complete the Work for the compensation stated in this Contract, and pursuant to the extent of [MasTec's] liability under this Contract, assume full and complete responsibility for any such conditions pertaining to the Work, the site of the Work or its surroundings, and all risks in connection therewith. In addition thereto, [MasTec] represents that it is fully qualified to do the Work in accordance with the terms of this Contract within the time specified.

Exhibits B and C to the contract place additional requirements on both parties.[4]  Under Exhibit B-1, titled "Contractor's Proposal," MasTec agreed to perform "everything necessary to complete, satisfy, and discharge all Work and obligations imposed on [MasTec] connected with the performance of the Work."  This included "[f]urnish[ing] all labor, equipment and materials as

---

[4] Article 24.1 of the contract expressly includes the exhibits as "part of this Contract for all purposes."

7

described in the Specifications for all Work necessary to perform the following applicable Work as shown on the Drawings, including, but not limited to: . . . welding (including tie-in and transition welds, if required)." Exhibit B-1 further describes the scope of MasTec's work:

> Any Work required to complete installation of the new pipeline but not shown as a pay item is no less included in the scope of work for installation of the new 8-inch Butane Shuttle pipeline and is included in [MasTec's] lump sum proposal. Just because an item of Work is not specifically identified, does not mean such Work is not included in [MasTec's] scope of Work. Any item of Work [MasTec] knows is required for completion of the installation but not specifically identified is to be included in [MasTec's] Lump Sum Proposal.

Exhibit C to the contract contains a lengthy collection of "Construction Specifications" for the project, which include the due diligence language on which MasTec relies. Specification LP-5, titled "Ditching," states under the heading "Company Foreign Line and Utility Crossings" that "[El Paso] will have exercised due diligence in locating foreign pipelines and utility line crossings. However, [MasTec] shall confirm the location of all such crossings and notify the owner prior to any ditching activity in the vicinity of the crossings." Near the end of Exhibit C, Specification LP-17, titled "Horizontal Directional Drilling," states under the heading "Foreign Line and Utility Crossings" that "[El Paso] will have exercised due diligence in locating foreign pipelines and/or utility line crossings. However, [MasTec] shall confirm the location of all such crossings and notify the owner prior to any [horizontal directional drilling] activity in the vicinity of the crossings."

Here, neither party contends that the terms of the contract are ambiguous. Indeed, the contract's plain terms are clear. MasTec agreed that it had "fully acquainted itself with the site, including without limitation . . . subsurface conditions, obstructions and all other conditions pertaining to the Work." It also agreed that it had "made all investigations essential to a full

8

understanding of the difficulties which may be encountered in performing the Work." In regard to potential work site conditions, MasTec "assume[d] full and complete responsibility for any such conditions pertaining to the Work, the site of the Work or its surroundings and all risks in connection therewith." All of this was agreed to "notwithstanding" "anything in any of the Contract documents or in any representations, statements or information made or furnished by [El Paso] or its representatives." These terms, in both Article 7.1(e) and Article 8.1(a)(7), clearly place the risk of undiscovered foreign crossings on MasTec. And they expressly resolve any tension between the due diligence specifications and the risk allocation provisions.[5] Because MasTec abandoned its fraud claim, MasTec is bound by the terms of this contract, regardless of whether it thought it contained different terms. *See In re Palm Harbor Homes, Inc.*, 195 S.W.3d 672, 676 (Tex. 2006) (holding that absent fraud, deceit, or misrepresentation in the signing of an agreement, the parties are bound by the agreement); *see also Lonergan v. San Antonio Loan & Trust Co.*, 104 S.W. 1061, 1066 (Tex. 1907) ("[I]n the absence of fraud or other improper influence, competent persons may make their own contracts for lawful purposes and will be required to perform them.").

MasTec argues that the contract's broad "all risks" provisions are limited by the specific exception in the due diligence specifications in Exhibit C. Under MasTec's reading of the contract, the "all risks" provisions set out the scope of MasTec's general responsibility, but the construction specifications remove from MasTec's responsibility the location of foreign crossings through the

---

[5] Although not raised by the parties, we note that Article 25 of the contract contains an order-of-precedence provision, which states: "Should any conflict exist or appear to exist between any parts or Exhibits of this Contract, such conflict shall be brought to the attention of [El Paso] and [El Paso] shall notify [MasTec] which Part or Exhibit shall have precedence." The very next provision, however, states that "Conflicts between the Drawings and the Specifications shall be interpreted in favor of the Drawings."

9

exercise of due diligence, a responsibility that was allocated to El Paso. That reading, however, ignores the plain language of the agreement: MasTec assumes "all risks in connection with" "soil structure, subsurface conditions, obstructions and all other conditions pertaining to the Work," "notwithstanding" anything else in the contract. The specified conditions relate to the physical environment of the pipeline's path, precisely the risk involved with unknown underground foreign crossings. MasTec seems to have understood as much; its senior vice president testified at trial that foreign crossings were included in the risks covered by Article 7.1(e). Just as we have held in the insurance policy context that "'all losses' means *all* losses," "all risks" in connection with the physical conditions of the pipeline's path must mean *all* risks. *See Enter. Leasing Co. v. Barrios*, 156 S.W.3d 547, 549 (Tex. 2004) (per curiam).

MasTec argues that our reading of the contract renders meaningless the two due diligence specifications. Indeed, when construing a contract, we strive to "give effect to all the provisions of the contract so that none will be rendered meaningless." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). While we have had occasion to give meaning to the phrase "due diligence" in other contexts, we must construe it here in conjunction with the specific rights and obligations contained in this contract. *See, e.g.*, *Via Net v. TIG Ins. Co.*, 211 S.W.3d 310, 314 (Tex. 2006) (discussing due diligence in the context of the relationship between royalty owners and lessees in oil and gas contracts); *cf. Strickland v. Lake*, 357 S.W.2d 383, 384 (Tex. 1962) ("The term 'diligence' is relative and incapable of exact definition. Its meaning must be determined by the circumstances of each case. Reasonable diligence has been defined as such diligence that an ordinarily prudent and diligent person would exercise under similar circumstances. It is usually a question of fact." (citations

omitted)). Because there is no indication that the parties intended to give "due diligence" any technical or special meaning, we give the phrase its "plain, ordinary, and generally accepted meaning." *See Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996). According to Black's Law Dictionary, "due diligence" is "[t]he diligence reasonably expected from, and ordinarily exercised by, a person who seeks to satisfy a legal requirement or to discharge an obligation." BLACK'S LAW DICTIONARY (9th ed. 2009). With that in mind, we must harmonize the due diligence specifications with the other contractual provisions to ascertain the true intentions of the parties. *See Coker*, 650 S.W.2d at 393.

The contract contemplates a joint effort by the parties. The due diligence specifications, which are contained in guidelines for the performance of ditching and horizontal directional drilling, state: "[El Paso] *will have exercised* due diligence in locating foreign pipelines and/or utility line crossings. However, [MasTec] shall confirm the location of all such crossings and notify the owner prior to any [ditching or horizontal directional drilling] activity in the vicinity of the crossings." Because of the joint nature of these obligations, our construction of this contract does not render these provisions meaningless; rather, our construction gives effect to the parties' intent that the parties agreed El Paso had already exercised due diligence to locate foreign crossings, but ultimately the risk of omissions and inaccuracies, including the obligation to investigate and protect against additional foreign crossings, falls on MasTec. Greg Floerke, MasTec's vice president of communications, which included the pipeline unit, explained: "Due diligence in my experience typically meant other than taking existing maps and lines—crossings and lines that are shown on

11

those maps, to take the extra step to go out [and] do something, additional due diligence to locate any foreign pipelines that might exist.

Before soliciting bids, El Paso took steps to locate foreign crossings. El Paso had only preliminary alignment sheets from the 1940s for the pipeline at issue, and no as-built alignment sheets. Knowing that those alignment sheets were "very poor" and "inadequate," and would not have shown any crossings installed after the pipeline was constructed, El Paso hired Gullett to survey the pipeline's right of way. El Paso instructed Gullett to locate as many foreign crossings as it could using metal detection and visual inspection, and to compile the findings into a map (the alignment sheets) that could be distributed to potential bidders. Using four crews, Gullett's surveyors walked the pipeline's entire right-of-way, using an M-Scope, an advanced pipeline-locating device to find metal pipelines, as well as PVC and fiberglass pipelines with metal tracers.[6] Although El Paso did not instruct Gullett to use other methods to locate PVC or fiberglass crossings that an M-scope and visual inspection would not detect, the record indicates that locating those lines would be very labor-intensive, often requiring digging by hand or using a vactron, a hydraulic vacuum cleaner that pressure washes holes. Moreover, although El Paso did have parallel pipelines in the same right-of-way, the alignment sheets for those lines were also from the 1940s and would not have shown foreign crossings built since then. Similarly, although Valero had a pipeline in the same right-of-way, that pipeline was decades old, and testimony indicated that it was not customary for pipeline

---

[6] Mike White, who assisted his father, Bill White, on the El Paso project, testified that PVC piping is required by law to contain metal stripping so that it can be located by surveying crews. Some of the undiscovered PVC pipeline in this case did not contain metal stripping, as it was placed before the enactment of the law, making it nearly impossible for an above-ground surveying crew to detect it.

12

companies to share their survey data. El Paso provided Gullett's full survey to potential bidders, and there is nothing to suggest that bidders were confused about the extent of El Paso's due diligence, which consisted of hiring Gullett to map the pipeline route using an M-scope and visual inspection to locate foreign crossings. Nor is there anything in the contract to indicate that the parties intended El Paso to have any additional due diligence obligation.

The dissent argues that El Paso's due diligence did not meet the industry standard because El Paso did not locate and disclose 85-90% of foreign crossings. As the dissent notes, we have discussed due diligence in terms of industry practice. ___ S.W.3d at ___ (citing *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 206 (Tex. 2006)). But the dissent essentially ignores the industry practice for locating foreign crossings on pipelines more than fifty years old, focusing on a numerical standard that is not supported by the record, which it believes should apply in every case. Moreover, the dissent disregards the parties' agreement that MasTec, which was given the complete alignment sheets and blank contract before it submitted a bid, acknowledged and assumed the risk of unknown foreign crossings, "notwithstanding" any other provision in the contract or any information furnished by El Paso. MasTec agreed that the work to be performed under the contract, including "all . . . procedures and techniques necessary to perform the Work," which required MasTec to "fully acquaint[] itself with the site . . . accessibility, soil structure, subsurface conditions, obstruction and all other conditions pertaining to the Work," was consistent with "accepted industry standards." Were we to hold, as the dissent would have us do, that locating less than 85-90% of foreign crossings is evidence of failure to exercise due diligence, we would disallow parties to define by contract what sort of diligence is due or to allocate by agreement the risk of additional unknown

13

foreign crossings, a result that runs counter to the freedom to contract. *See Gym-N-1 Playgrounds, Inc. v. Snider*, 220 S.W.3d 905, 912 (Tex. 2007). We refuse to amend the contract judicially to substitute an unsupported standard for the contracted-for requirement that El Paso "*will have exercised due diligence.*"

El Paso's initial obligation to have exercised due diligence does not limit the risk allocated to MasTec for omissions and inaccuracies in El Paso's foreign crossings information. In fact, the record indicates that MasTec understood the joint obligation contemplated by the contract. MasTec's comptroller for the project testified that "[i]t's standard procedure in every job" for the contractor to survey a pipeline's right-of-way to identify foreign crossings and their exact location. He further testified that such work was within MasTec's scope of work under this contract, and that MasTec's bid included the cost of hiring a surveying crew to locate foreign crossings. MasTec included a 15% markup in the bid as a contingency for undiscovered foreign crossings, higher than the 10% usually included for similar projects. Additionally, MasTec's senior vice president acknowledged that, under Article 7.1(e) of the contract ("anything in this Contract . . . notwithstanding"), MasTec assumed the risk of unknown foreign crossings. In its response to El Paso's motion for judgment notwithstanding the verdict, MasTec even admitted that if El Paso exercised due diligence in identifying foreign crossings, "MasTec would be responsible for the costs associated with those crossings unidentified on the Drawings." The problem arises in this case because although MasTec understood the risk of underground surprises and knew it assumed the risk for such surprises, even including a contingency markup in its bid, MasTec, which was new to pipeline construction, underestimated the amount of that risk and submitted a very low bid. The role

14

of the courts is not to protect parties from their own agreements, but to enforce contracts that parties enter into freely and voluntarily. *See Wood Motor Co. v. Nebel*, 238 S.W.2d 181, 185 (Tex. 1951).

MasTec argues that our construction of the contract renders meaningless other provisions, such as those relating to weather conditions, acts of God, and bodily injury. But those conditions and circumstances do not arise in the context of the physical environment of the pipeline's path, and thus do not fall within the plain language of the "all risks" provision at issue here, which limits the risks MasTec assumed to "conditions pertaining to the Work." The fact that those other risks are expressly addressed elsewhere in the contract does not affect the meaning of the "all risks" provisions in 7.1(e) and 8.1(a)(7). In fact, those other contract provisions support our reading of the contract because they show that the parties knew how to state clearly when some risks were not to be assumed by MasTec.

Our jurisprudence supports this construction of the contract. In *Lonergan v. San Antonio Loan & Trust Co.*, we held that for an owner to be liable to a contractor for a breach of contract based on faulty construction specifications, the contract must contain terms that could fairly imply the owner's "guaranty of the sufficiency of the specifications," which were provided to the owner by an architect. 104 S.W. at 1066. Here, as in *Lonergan*, El Paso did not guarantee the accuracy of Gullett's alignment sheets. El Paso and MasTec both relied on what Gullett's surveyors were able to locate, with the negotiated provision that MasTec would confirm the surveyor's work and assume the risks of "subsurface conditions, obstructions, and other conditions pertaining to the Work." We adhere to the "practically . . . universal rule" that "where one agrees to do, for a fixed sum, a thing possible to be performed, he will not be excused or become entitled to additional compensation,

15

because unforeseen difficulties are encountered." *City of Dallas v. Shortall*, 114 S.W.2d 536, 540 (Tex. 1938) (internal quotation marks omitted).

Someone has to bear the loss of the additional costs of constructing the pipeline around the undiscovered foreign crossings. As in *Lonergan*, "the parties were each competent to contract, and there is no circumstance indicating the slightest unfairness in the transaction." 104 S.W. at 1065. While MasTec was new to this type of construction project, it is a sophisticated party and presumably had experienced attorneys review the contract. *See Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 179 (Tex. 1997) (allowing sophisticated parties to contractually preclude a claim for fraudulent inducement); *see also Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 350 (Tex. 2011). And there is nothing to suggest that the contractual provisions at issue here are unique or novel. Sophisticated parties, like all parties to a contract, have "an obligation to protect themselves by reading what they sign." *Thigpen v. Locke*, 363 S.W.2d 247, 253 (Tex. 1962). Ultimately, this contract "constitute[s] the allocation by market participants of risks and benefits" regarding the pipeline's construction. *Provident Life Ins. & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 220 (Tex. 2003). "The Court's role is not to redistribute these risks and benefits but to enforce the allocation that the parties previously agreed upon." *Id.* (citing 11 RICHARD A. LORD, WILLISTON ON CONTRACTS § 31.5 (4th ed. 2003)).

We have an obligation to construe a contract by the language contained in the document. We have "long recognized Texas' strong public policy in favor of preserving the freedom of contract." *Fairfield Ins. Co. v. Stephens Martin Paving, L.P.*, 246 S.W.3d 653, 664 (Tex. 2008); *see also Wood Motor Co. v. Nebel*, 238 S.W.3d 181, 185 (Tex. 1951). "Freedom of contract allows parties to . . .

16

allocate risk as they see fit." *Gym-N-I Playgrounds, Inc.*, 220 S.W.3d at 912. Contract enforcement is an "indispensable partner" to the freedom of contract. *Fairfield*, 246 S.W.3d at 664. Were we to hold in MasTec's favor, and conclude that El Paso must bear the risk of unknown underground obstacles under this contract, we would render meaningless the parties' risk-allocation agreement and ultimately prohibit sophisticated parties from agreeing to allocate risk in construction contracts. *See Gyn-N-I Playgrounds, Inc.*, 220 S.W.3d at 912; *Italian Cowboy Partners*, 341 S.W.3d at 333 (instructing that we examine the entire writing and harmonize all provisions, rendering none meaningless). That result would undermine the longstanding policy of this state.

## V. Conclusion

For the reasons expressed above, we hold that the contract allocated risk for undiscovered foreign crossings to MasTec, and MasTec therefore must bear the loss of additional costs associated with the unknown foreign crossings. Because MasTec was contractually obligated to bear this loss, we agree with the trial court that the jury's answers to questions about MasTec's recovery for breach of contract based on due diligence are immaterial. Accordingly, we reverse the court of appeals' judgment and reinstate the judgment of the trial court.

_____
Paul W. Green
Justice

OPINION DELIVERED: December 21, 2012

17