# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-23-00733-CV

---

**Nora Lyn McKinnis Nichols, Appellant**

**v.**

**Charles S. Nichols, II, Appellee**

---

### FROM THE 353RD DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-21-007313, THE HONORABLE J. DAVID PHILLIPS, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Nora Lyn McKinnis Nichols appeals from the trial court's final judgment granting Charles S. Nichols, II's request for declarations under the Texas Uniform Declaratory Judgments Act construing an Agreement Incident to Divorce entered into by Nora and Charles.[1]  *See* Tex. Civ. Prac. & Rem. Code §§ 37.001-.011 (UDJA).  The trial court also rendered judgment that Nora take nothing on her counterclaims for fraud and fraudulent inducement related to the execution of the Agreement Incident to Divorce.  We will affirm.

## BACKGROUND

Nora and Charles married in 1991 and separated in 2009.  During their marriage, Charles accumulated substantial real estate interests that were held primarily through two groups of companies: (1) KN Corporation; Kadison-Nichols, Ltd; Kadison Nichols Capital,

---

[1] Because the parties share a surname, we refer to them by their given names for clarity.

LLC; Acquitas Capital Advisors, Inc.; Mopac, Inc.; and WNKMgmt, LP, collectively referred to as "the KN Companies" and (2) Minerva, Ltd. After separating, Nora and Charles engaged in negotiations regarding the division of the marital estate, including the community's interests in the KN Companies and Minerva, Ltd. How both the distributions from these companies and management fees received from these companies were divided between Charles and Nora in the divorce is the principal source of disagreement between the parties. As part of the negotiations to divide the marital estate, Nora and Charles signed an informal settlement agreement in October 2012. The first page of the agreement states in bold capital letters "**THIS AGREEMENT IS BINDING AND IRREVOCABLE.**" The parties refer to this agreement as the "Binding Settlement Agreement" (BSA), and it consists of a spreadsheet listing assets and liabilities of the parties and sets forth a division of each of those assets and liabilities between them. The BSA provides that the "Total Community Estate" is valued at $12,154,024 and is divided 44.25% to Nora and 55.75% to Charles. The BSA also includes a section titled "Additional Understandings and Agreements by the Parties," which provides in relevant part:

> Parties agree that the order of need for payment is the following, IRS, Bank debt, Investors, then Charlie & Nora.

> All prior years of marriage Nora and Charlie shall share equally in any tax liability, interest, and penalties or refund whichever is applicable.

> Charlie shall provide list of all other companies that he has referred to in discussing KN monies to both parties.

> Entity verification through review of annual financial statement (audit on the Funds) and tax returns. In addition tax returns for [KN], Et al and Minerva will be provided on annual basis as provided to Charlie by law. It is understood, investor identities, except for Charlie, will be redacted. To the extent necessary, Nora will sign a confidentiality agreement with regard to the review of said documents.

Income verification to be via inspection of the individual tax return and financial statement.

If Charlie receives future income during the initial seven year term for payout of the unpaid management fees and distribution from [KN] and Minerva, it would be carved out of the tax return so as to determine the effective tax rate and to determine if any rebate on the pretax paid were due Nora.

In conclusion, it is expressly understood that this agreement constitutes the whole of the settlement terms and conditions between the parties, as it relates to the terms and conditions listed herein. No other promise or agreement shall be binding unless signed by the parties. The parties further agree that this agreement was entered into voluntary [sic] and was not the result of coercion or threats of any kind. In addition, the parties agree that, other than the rights and privileges allowed by the court order (final decree), the parties agree to not engage in any other litigation herein concerning the terms and conditions of the settlement stipulated.

The BSA was signed on October 12, 2012.

Finalizing the divorce took several years. In December 2016, the court signed an Agreed Final Decree of Divorce. Regarding the division of the marital estate, the Decree states:

**Agreement**

The Court finds that the parties first entered into an informal binding settlement agreement on October 15, 2012 (hereinafter, the "Binding Settlement Agreement"). To implement the provisions of their Binding Settlement Agreement, the parties have subsequently agreed to the terms of this Agreed Final Decree of Divorce and have separately entered into an Agreement Incident to Divorce. The Court notes that it has reviewed and hereby approves the Agreement Incident to Divorce and incorporates it by reference as part of this Agreed Final Divorce as if it were recited herein verbatim, and orders the parties to do all things necessary to effectuate the Agreement Incident to Divorce. The Court finds that a copy of the Agreement Incident to Divorce is not being filed with the records of this Court. Rather, the Court finds that each party and attorney has retained at least one executed original thereof.

**Merger of Binding Settlement Agreement**

The Court finds that this Agreed Final Decree of Divorce, the related Agreement Incident to Divorce, and the ancillary documents executed or to be executed by the parties to implement their settlement (collectively herein referred to as the

Final Settlement Documents), are stipulated by the parties to represent an integrated merger of the parties' Binding Settlement Agreement. The Court finds that the Final Settlement Documents are the parties' final representations of their agreements, and to the extent there exist any differences between the Binding Settlement Agreement and the Final Settlement Documents, the Final Settlement Documents shall control in all instances.

The Decree also states that "the parties stipulate that the Agreement Incident to Divorce [] is enforceable as a contract" and "the parties shall have all remedies available for enforcement of a contract." The Agreement Incident to Divorce was executed by the parties on December 15, 2016.

At issue in this case is how the parties agreed to divide three specific assets held by the marital estate: (1) Nora and Charles's interest in the KN Companies; (2) guarantee and management fees owed to Nora and Charles by the KN Companies; and (3) Nora and Charles's interest in Minerva, Ltd. Regarding these assets, a section titled "Assets to Nora Nichols" in the Agreement Incident to Divorce provides that Nora is to receive:

> W-13. With regard to KN Corporation, Kadison-Nichols, Ltd, Kadison-Nichols Capital, LLC, Acquitas Capital Advisors, Inc, Mopac, Inc, and WNK Mgmt, LP, if, as and when funds are distributed by such entities relative to assets held on or before October 15, 2012, Nora Nichols shall receive 43% of all such funds (net of taxes) and Charles Steve Nichols II shall receive 57% of all such funds (net of taxes), after Charles Steve Nichols, II withholds 20% for Federal Income Taxes, up to a maximum of $740,000 until such time as all proceeds from such assets held on or before October 15, 2012 have been distributed in full.

> W-14. Up to $580,000 gross ($411,800 net after taxes using 29% tax rate), to be paid to Nora Nichols if, as and when such guarantee and/or management fees are paid to Charles Steve Nichols II. The actual amount of the guarantee and/or management fees to be paid are to be determined by audited financial statements as of December 31, 2012, and the actual value could be greater or lesser than $1,160,000, with Charles Steve Nichols, II and Nora Nichols each receiving his/her proportionate interest in the actual amount of unpaid guarantee/ management fees from the KN Companies. The unpaid fees are to be treated as ordinary income and whatever taxes due will be deducted off the top and the

4

remainder shared equally until such time as the total amount of $411,800 net after taxes using 29% tax rate (a capped rate) is paid to Nora Nichols.

W-15. With respect to Minerva, Ltd., Nora Nichols is awarded 20% of all amounts distributed to Charles Steve Nichols, II, to be paid by Charles Steve Nichols, II to Nora Nichols if, as and when he receives such distributions, until such time that Nora Nichols receives, net of 20% withholding of such amounts, up to the sum of $800,000, to be paid from distributions of the sale of Minerva, Ltd. assets until all such assets have been distributed. Nora Nichols shall receive no flow-through taxation, any other taxation, or any other incidents of ownership of Minerva, Ltd. and/or the KN Companies, including no tax liability for any other type of payments or charges that may accrue tax consequences, such as retained earnings or any other pass-through or flow-through item (it being understood that Charles Steve Nichols, II will assume full responsibility for all such taxes, and shall pay such taxes on Nora Nichols' share, at rates herein agreed, prior to making distributions to her as provided herein).

The Agreement Incident to Divorce included the following "Release of All Claims":

Each party to this agreement releases the other from all claims, liabilities, debts, obligations, actions, and causes of action of every kind relating to or arising from the marriage between the parties, including any matters that could have been claimed at this time but were not. However, neither party is relieved or discharged from any obligations contained in this agreement, the parties' Agreed Final Decree of Divorce or under any instrument or document executed in accordance with this agreement and/or the parties' Agreed Final Decree of Divorce.

The Agreement Incident to Divorce also stated:

This Agreement Incident to Divorce and the Agreed Final Decree of Divorce supersede all other agreements, either oral or in writing, between the parties relating to the rights and liabilities arising out of their marriage. This Agreement Incident to Divorce and the Agreed Final Decree of Divorce contain the entire agreement of the parties.

On December 15, 2016, the parties also signed two addenda to the Agreement Incident to Divorce. Relevant to the issues in this case is the Second Addendum to the Agreement Incident to Divorce (the Second Addendum), which provides in pertinent part:

5

3. The parties agree that, with regard to the amounts awarded to Nora Nichols under [W-15], Nora Nichols is owed, as of the date of this Second Addendum, the sum of $764,203.53.

4. The parties agree that, with regard to the amounts awarded to Nora Nichols under [W-13], Nora Nichols is owed, as of the date of this Second Addendum, the sum of $738,799.92.

Charles maintains that provision number 4 in the Second Addendum was intended to address the fact that, in 2013, he paid Nora $1,200.08 in funds distributed by the KN Companies, which reduced the balance owed to Nora under W-13 of the Agreement Incident to Divorce from $740,000 to $738,799.92. Provision number 3, according to Charles, was intended to address the fact that he had, before execution of the Agreement Incident to Divorce, made a payment of $35,796.47 to Nora from distributions of the sale of Minerva, Ltd. assets, which reduced the balance owed to Nora under W-15 of the Agreement Incident to Divorce from $800,000 to $764,203.53.

Five years after the trial court signed the Final Decree of Divorce and the parties executed the Agreement Incident to Divorce, Charles filed a petition in Travis County district court seeking certain declarations about his obligations under the Agreement Incident to Divorce. *See* Tex. Civ. Prac. & Rem. Code § 37.004(a) (providing that person interested under contract may have determined any question of construction arising under contract and obtain declaration of rights, status, or other legal relations thereunder). Relevant to this appeal, Charles requested that the court declare that:

Payments to Nora under [W-13] of the Agreement Incident to Divorce (as modified by the Second Addendum) are capped at a maximum of $738,799.92.

Payments to Nora under [W-14] of the Agreement Incident to Divorce are capped at a maximum of $580,000 gross and/or $411,800 after applying a 29% tax rate

6

(or, as adjusted by December 31, 2012 financial statements, at $753,848.67 gross and/or $535,232.55 after applying a 29% tax rate).

Payments to Nora under [W-15] of the Agreement Incident to Divorce (as adjusted by the Second Addendum) are capped at a maximum of $764,203.53.

Charles is not required to pay Nora any amounts for guarantee or management fees that were waived, foregone, and/or otherwise never actually paid to Charles.

Nora filed a general denial and asserted counterclaims for fraud and fraudulent inducement, alleging that Charles "misrepresented the assets, the value of the assets, and liabilities attached to the assets of the marital estate during and after negotiations for division of that marital estate." Charles responded to Nora's counterclaims with a general denial and asserted a number of affirmative defenses, including statute of limitations; release; and consent, ratification, and/or accord and satisfaction.

After the parties engaged in discovery, Charles filed a motion for summary judgment. Charles asserted that, as a matter of law, Nora's fraud claims were barred by the statute of limitations, by a release of claims contained in the Agreement Incident to Divorce, and by her ratification of the parties' agreement by accepting its benefits, including payments by Charles to Nora totaling approximately $1 million, for five years. Charles further asserted that he was entitled to summary judgment on Nora's fraud claims because, as a matter of law, the summary-judgment evidence negated essential elements of those claims. These elements included (1) whether Nora's reliance on Charles's alleged misrepresentations was justifiable and (2) whether Charles failed to disclose material facts to Nora that he was required to disclose. Regarding his request for declaratory relief, Charles asserted that the relevant provisions of the Agreement Incident to Divorce are unambiguous and plainly provide that the interest in the

7

assets awarded to Nora in W-13, W-14, and W-15 of that agreement are each, by the agreement's terms, capped at a certain dollar amount.

After considering the motion, Nora's response, and the summary-judgment evidence, the trial court granted Charles's motion for summary judgment. In the summary-judgment order, the trial court ordered that Nora take nothing on her counterclaims for fraud and fraudulent inducement and dismissed them with prejudice. Relevant to this appeal, the court also issued the following declarations:

a. Under the Agreement Incident to Divorce between the parties, Charles's payments to Nora based on distributions by the KN Companies were capped at $738,799.92;

b. Under the Agreement Incident to Divorce, Charles's payments to Nora based on management and guarantee fees were capped at $753,848.67 gross before taxes and $535,232.55 net after taxes;

c. Under the Agreement Incident to Divorce, Charles' payments to Nora based on distributions by Minerva were capped at $764,203.53;

d. Under the Agreement Incident to Divorce, the combined unpaid balance owed by Charles to Nora pursuant to three foregoing caps is $709,601.32 in total.

Thereafter, the parties resolved Charles's request for attorneys' fees by agreement, and the trial court signed a final judgment that recited: "Because no further claims remain for trial, it is appropriate to enter this Final Judgment, which makes the Order Granting Plaintiff Charles Nichols' Motion for Summary Judgment a final appealable order and implements the Parties' agreement regarding attorneys' fees."[2] Nora then perfected this appeal.

_____

[2] The parties agreed that Charles would recover attorneys' fees in the amount of $150,000, which he was entitled to apply as an offset toward the balance the trial court determined he owed Nora under the Agreement Incident to Divorce.

8

**DISCUSSION**

We review a summary judgment de novo. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding evidence contrary to the nonmovant unless reasonable jurors could not. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). We indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008). A defendant is entitled to summary judgment on an affirmative defense if the defendant conclusively proves all the elements of the affirmative defense. *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508-09 (Tex. 2010); *see* Tex. R. Civ. P. 166a(b), (c). To accomplish this, the defendant-movant must present summary judgment evidence that conclusively establishes each element of the affirmative defense. *See Chau v. Riddle*, 254 S.W.3d 453, 455 (Tex. 2008). When, as here, the trial court's summary judgment order does not state the basis for the trial court's decision, we must affirm the order if any of the theories presented to the trial court and preserved for appellate review are meritorious. *See Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex. 2003); *Star-Telegram, Inc. v. Doe*, 915 S.W.2d 471, 473 (Tex. 1995).

### Declaratory Judgment Construing Agreement Incident to Divorce

The trial court granted Charles's motion for summary judgment, construed the relevant terms of the Agreement Incident to Divorce, and granted Charles declaratory relief regarding its terms. On appeal, Nora challenges the trial court's declarations, asserting that

the relevant provisions were ambiguous, creating a fact issue precluding summary judgment. We disagree.

Absent ambiguity, contracts are construed as a matter of law. *Moayedi v. Interstate 35/Chisam Rd., L.P.*, 438 S.W.3d 1, 7 (Tex. 2014). In construing a written contract, our primary objective is to ascertain the parties' true intentions as expressed in the language they chose. *Id.* We "construe contracts from a utilitarian standpoint bearing in mind the particular business activity sought to be served," and avoiding unreasonable constructions when possible and proper. *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987). To that end, we consider the entire writing, harmonizing and giving effect to all the contract provisions so that none will be rendered meaningless. *Moayedi*, 438 S.W.3d at 7. No single provision taken alone is given controlling effect; rather each must be considered in the context of the instrument as a whole. *Id.* We also give words their plain, common, or generally accepted meaning unless the contract shows that the parties used words in a technical or different sense. *Id.*

A contract is not ambiguous if the contract's language can be given a certain or definite meaning. *El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 806 (Tex. 2012). But if the contract is subject to two or more reasonable interpretations after applying the pertinent construction principles, the contract is ambiguous, creating a fact issue regarding the parties' intent. *Id.* Summary judgment is not the proper vehicle for resolving disputes about an ambiguous contract, but it may resolve a dispute about an unambiguous one. *See Provident Life*, 128 S.W.3d at 215-16 (summary judgment is proper if no genuine issue of material fact exists).

While extrinsic evidence of the parties' intent is not admissible to create an ambiguity, the contract may be read in light of the circumstances surrounding its execution to determine whether an ambiguity exists. *Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738,

10

741 (Tex. 1998). Consideration of the surrounding facts and circumstances is simply an aid in the construction of the contract's language and has its limits. *Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 731 (Tex. 1981). The rule that extrinsic evidence is not admissible to create an ambiguity "'obtains even to the extent of prohibiting proof of circumstances surrounding the transaction when the instrument involved, by its terms, plainly and clearly discloses the intention of the parties, or is so worded that it is not fairly susceptible of the more than one legal meaning or construction.'" *Id.* at 732 (quoting *Lewis v. East Tex. Fin. Co.*, 146 S.W.2d 977, 980 (Tex. 1941)). Mere disagreement over the interpretation of an agreement does not necessarily render the contract ambiguous. *See City of Pasadena v. Gennedy*, 125 S.W.3d 687, 693 (Tex. App.— Houston [1st Dist.] pet. denied).

Nora complains that the trial court erred in granting summary judgment construing three provisions of the Agreement Incident to Divorce, arguing that ambiguity in each of them creates a fact issue about the parties' intent that precludes summary judgment. Specifically, Nora argues that the trial court erred in determining that the Agreement Incident to Divorce imposes a cap on the dollar amount Nora can receive as her portion of the three marital assets addressed in W-13, W-14, and W-15.

**W-13: Distributions from KN Companies**

W-13 provides that, "if, as and when funds are distributed" by the KN Companies, "[Nora] shall receive 43% of all such funds (net of taxes) and [Charles] shall receive 57% of all such funds (net of taxes), after [Charles] withholds 20% for Federal Income Taxes, up to a maximum of $740,000 until such time as all proceeds from such assets held on or before October 15, 2012 have been distributed in full." Charles argues that this provision gives Nora a

11

right to receive up to $740,000 in funds distributed by the KN Companies, with each individual distribution divided between Nora and him on a 43/57 percentage basis. Nora counters that the provision is ambiguous because (1) the term "all such funds (net of taxes)" describes both Nora's and Charles's share, and (2) the phrase "up to a maximum of $740,000" follows the tax withholding provision rather than the description of Nora's share. We disagree that either of these features renders this provision ambiguous. First, the provision addresses both Nora's and Charles's shares in the context of the way each distribution will be divided when made. Rather than Nora receiving 100% of the KN Companies' fund distributions "if, as and when" they are made, the provision specifies that Nora receives 43% "of all such funds" and Charles receives 57% "of all such funds." Moreover, as for any question about whether the provision is referring to Nora's rights with regard to the KN Companies' distributions or to Charles's, that question is resolved by the fact that this provision is in the section of the Agreement Incident to Divorce that defines *Nora's* share of the marital assets. Thus, it is intended to describe the amount of funds distributed by the KN Companies that Nora, not Charles, may receive. Second, the placement of the words "up to a maximum of $740,000" after the withholding provision does not create a reasonable alternative interpretation of the provision that the cap refers to the tax withholding rather than to the total amount of "all such funds" Nora is to receive. The withholding provision, which is set off by commas, refers to the percentage of tax withholding that will apply to the KN Companies' distribution before the distribution is divided on a 43/57 percentage basis. This is consistent with the preceding description of each divided distribution being "net of taxes" and represents the parties' agreement that the amount available to be distributed to the parties each time there is a distribution will be reduced by 20% for taxes and then divided between Nora and Charles on the 43/57 percentage basis. Finally, any question about whether W-13 places a

$740,000 cap on the amount Nora is awarded from the KN Companies' distributions is answered by the language of the Second Addendum to the Agreement Incident to Divorce, which provides that "the parties agree that, with regard to the amounts awarded to Nora Nichols under [W-13], Nora Nichols is owed, as of the date of this Second Addendum, the sum of $738,799.92." The Second Addendum plainly states that Nora is owed a sum certain, confirming that the interest in the KN Companies' distributions that Nora was awarded in W-13 was a specific dollar amount that Nora and Charles agreed had been reduced to $738,799.92. The circumstances surrounding execution of the Second Addendum, specifically Charles's previous payment to Nora of $1,200.08 of the KN Companies' distributions, supports construction of the Agreement Incident to Divorce and the Second Addendum to cap the amount of the KN Companies' distributions awarded to Nora at $740,000. *See Sun Oil Co.*, 626 S.W.2d at 731 (holding that consideration of surrounding facts and circumstances may aid in construction of contract's language).

**W-14: Guarantee and/or Management Fees from KN Companies**

W-14 provides that Nora receives "[u]p to $580,000 gross ($411,800 net after taxes using 29% tax rate), to be paid to [Nora] if, as and when such guarantee and/or management fees are paid to [Charles]." W-14 further notes that "the actual amount of the guarantee and/or management fees are to be determined by audited financial statements as of December 31, 2012" and states that "the actual value could be greater or lesser than $1,160,000" and that Charles and Nora will receive his or her "proportionate share in the actual amount of unpaid guarantee/management fees from the KN Companies." In his summary-judgment motion, Charles submitted copies of the audited financial statements, which showed that the actual amount of the management and guarantee fees as of December 31, 2012, was

13

$3,015,394.68.  The summary-judgment evidence established that Charles, as a 50% owner of the KN Companies,[3] was entitled to receive half the total fees—$1,507.697.34.  Thus, after the anticipated adjustment to the amount of fees determined by the audited financial statements, Nora and Charles were each to receive their "proportionate share"—which was undisputed to be a 50/50 percent split—of the $1,507,597.34.  Before taxes, Nora's 50% share of $1,507,597.34 would be $753,848.67.  After applying the agreed upon 29% tax rate, Nora's net share would be $535,232.55.  After considering the summary-judgment evidence, the court declared that Nora's interest in the KN Companies' guarantee and/or management fees pursuant to W-14 was capped at $753,848.67 gross and $535,232.55 net after taxes.

On appeal, Nora does not challenge the court's declaration regarding the dollar amount of Nora's share of the guarantee and/or management fees under the provisions of W-14.  Instead, she challenges another of the court's declarations related to W-14, specifically the declaration that "Charles has no obligations to make future payments to Nora based on guarantee or management fees, as such fees were waived."  This declaration was based on summary-judgment evidence submitted in Charles's affidavit that the KN Companies had "waived all of the guarantee and management fees that were accrued and unpaid as of December 31, 2012."  Charles attested that "[t]he waiver was done because the investment funds had been extended well beyond their initially planned terms and continuing to charge fees under those circumstances would have been detrimental to investor relations."  Charles explained that, as a result, he would not receive "any more of the remaining guarantee and management fees that were accrued and unpaid as of December 31, 2012."  Relying on this evidence and the terms of

---

[3]  The summary-judgment evidence established that the other 50% of the KN Companies was owned by Charles's business partner.

14

W-15, which required Charles to make payments to Nora "if, as and when such guarantee and/or management fees are paid to [Charles]," Charles argued that he had no further obligation to make payments to Nora "based on guarantee or management fees" because the KN Companies' waiver of fees accrued and unpaid as of December 31, 2012, meant that no additional fees for that time period would ever be paid to him.

On appeal, Nora argues that the trial court's declaration was error because "Charles did not point to the KN Companies' audited financial statements as of December 31, 2012 to support his conclusion that the 'actual amount' of fees to be paid is zero." But the trial court's declaration that Charles had no further obligation[4] to pay guarantee and management fees was not based on financial statements but, rather, on the language in W-14 providing that Nora's payments would be made to her by Charles "if, as and when" guarantee and/or management fees were paid to Charles and on summary-judgment evidence that no such fee payments would be forthcoming. And Charles did provide evidence of the audited financial statements as of December 31, 2012, which under W-14 were the basis for determining "[t]he actual amount of the guarantee and/or management fees to be paid," and that evidence formed the basis for the trial court's declaration that the dollar amount of guarantee and management fees awarded to Nora under W-14 was capped at $535,232.55 net after taxes, a declaration that Nora does not challenge on appeal.

Nora also argues on appeal that "nothing in W-14 contemplates that the KN Companies would be entitled to a 'waiver' of fees" and that this concept is supported only by Charles's "self-serving declaration." Charles's affidavit, however, does not state that the KN

---

[4] Charles submitted summary-judgment evidence that he had paid Nora $131,567.00 in management fees he received from the KN Companies.

Companies waived the guarantee and management fees based on any provision of the Agreement Incident to Divorce, including W-14. Instead, he attests that the KN Companies waived the fees that were accrued and unpaid as of December 31, 2012, for business reasons unrelated to the Agreement Incident to Divorce or any of its provisions. Nora does not point to any evidence tending to show that the KN Companies' authority to waive the fees to which it might otherwise be entitled had to arise from the Agreement Incident to Divorce. While Nora asserts that the parties did not contemplate that "Charles could simply 'waive' these fees," the summary-judgment evidence was not that *Charles* waived the fees but that the *KN Companies* did so. Finally, Nora complains that the only evidence of the waiver is Charles's sworn testimony unsupported by any business records or meeting minutes. But Nora did not object to this summary-judgment evidence, which was the undisputed sworn testimony of a person with personal knowledge of the stated facts. *See* Tex. R. App. P. 33.1(a).

## W-15: Distributions from Minerva, Ltd.

W-15 provides that "if, as and when" Charles receives distributions from Minerva, Ltd., Nora is "awarded 20% of all amounts distributed" to Charles "until such time as [Nora] receives, net of 20% withholding on such amounts, up to the sum of $800,000, to be paid from the sale of Minerva, Ltd. assets until all such assets have been distributed." Charles argues that this provision gives Nora a right to receive up to $800,000 in funds distributed from the sale of Minerva, Ltd. assets, with each individual distribution divided between Nora and him on a 20/80 basis after withholding 20% of the distribution for taxes. Nora counters that the provision is ambiguous because it could be read either as Charles proposes or, alternatively, to mean that the $800,000 cap applies not to the total amount awarded to Nora but to the amount of

16

distributions subject to the 20% tax withholding requirement. We do not agree that Nora's proposed alternative interpretation of W-15 is a reasonable one. If the language "up to the sum of $800,000" relates to or describes the amount subject to the tax withholding requirement, then there is no dollar amount attached to the language "until such time as [Nora] receives." It is unreasonable to interpret a provision in the Agreement Incident to Divorce that is intended to define the value of an asset awarded to Nora to *not* define the value of that asset. Again, any remaining question about whether W-15 caps Nora's right to receive distributions from the sale of Minerva, Ltd. assets at a total of $800,000 is answered by the language of the Second Addendum to the Agreement Incident to Divorce, which provides that "the parties agree that, with regard to the amounts awarded to [Nora] under [W-15], [Nora] is owed, as of the date of this Second Addendum, the sum of $764,203.53." The Second Addendum plainly states that for W-15 Nora is owed the fixed amount of $764,203.53, an amount under the $800,000 payment cap. The circumstances surrounding execution of the Second Addendum, specifically Charles's previous payment to Nora of $35,796.47 in Minerva, Ltd. distributions, which would have reduced the total amount owed to $764,203.53, supports construction of the Agreement Incident to Divorce to cap the amount of Minerva, Ltd. distributions awarded to Nora at $800,000. *See Sun Oil Co.*, 626 S.W.2d at 731 (holding that consideration of surrounding facts and circumstances may aid in construction of contract's language).

We conclude that the trial court did not err in determining that the Agreement Incident to Divorce was unambiguous, granting Charles's motion for summary judgment, and construing provisions W-13, W-14, and W-15. We overrule Nora's second appellate issue.

17

***Fraud and Fraudulent Inducement***

Charles moved for summary judgment on Nora's fraud and fraudulent inducement claims asserting, among other arguments, that the evidence conclusively established that any reliance by Nora on Charles's alleged misrepresentations was not justifiable. *See Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 501 (Tex. 2019) (holding that justifiable reliance can be negated as matter of law when evidence establishes that reliance is unwarranted). Justifiable reliance is an element of both common law fraud and fraudulent inducement claims. *See PAS, Inc. v. Engel*, 350 S.W.3d 602, 612 (Tex. App.—Houston [14th Dist.] 2011, no pet.). The claimant's reliance must be both actual and justifiable to support a fraud claim. *See Grant Thornton L.L.P. v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010). Although generally a question of fact, the issue of justifiable reliance becomes a question of law when the undisputed or conclusively proven facts demonstrate circumstances under which reliance cannot be justified. For example, a party's reliance on a representation is not justified when the party had actual knowledge of the representation's falsity at the time of the alleged reliance. *See, e.g., JSC Neftegas-Impex v. Citibank, N.A.*, 365 S.W.3d 387, 407-09 (Tex. App.—Houston [1st Dist.] 2011, pet. denied). Additionally, a party cannot justifiably rely on a statement that directly contradicts the express terms of the parties' written agreement. *DeClaire v. G & B Mcintosh Family Ltd. P'ship*, 260 S.W.3d 34, 46-47 (Tex. App.—Houston [1st Dist.] 2008, no pet). We must consider the parties' justifiable reliance arguments in the context of the representations allegedly made and the parties' written agreement contained in the Agreement Incident to Divorce.

In her petition, Nora alleges that in October 2012, when the parties negotiated the terms of the Binding Settlement Agreement, which later was memorialized in the Agreement

18

Incident to Divorce, Charles provided a list of the assets to be divided as well as their values. Nora alleges that she relied on the information Charles provided when entering into the Agreement Incident to Divorce in 2016. According to Nora, she has since learned that the list of assets and the values assigned to them by Charles in 2012 were not accurate, which she alleges has caused her economic injury. The basis of Nora's fraud claims, as alleged in her petition, is the allegation that she believed in 2012 and in 2016 that the lists of assets and the values of those assets Charles provided to her were accurate and that she relied on their being accurate when she entered into the Agreement Incident to Divorce. In her response to Charles's summary-judgment motion, Nora asserted that the Agreement Incident to Divorce was "a more formal document" than the Binding Settlement Agreement, but that its payment terms did not identify fixed amounts awarded to Nora for the assets but were amounts that were "dependent on the actual values of the entities." Nora maintains that she relied on the completeness and accuracy of the lists of assets and their values Charles provided when executing the Agreement Incident to Divorce. We consider whether, in light of the summary judgment evidence, such reliance was justifiable.

As part of her summary judgment evidence, Nora submitted the affidavit of her brother Frank McKinnis, an attorney who assisted in the parties' negotiations surrounding division of the marital assets. In his affidavit, McKinnis stated:

• The values for the assets to be divided by the parties to the Binding Settlement Agreement were provided by Charles and were for the purpose of reaching the framework of an agreement with the understanding that once financial statements and values were available, the exact payment amounts would be calculated.

• No evidence was provided during the settlement process to establish the bona fides of the representations Charles made as to the identity and value of the assets comprising the marital estate.

19

• These values were used to get the settlement going with the understanding the actual values would be finalized once the financial records were available.

• Charles represented that Mike Benaglio had actually put together the spreadsheet of assets and values that was utilized during the negotiations.

• Although the parties agreed in the Binding Settlement Agreement to the percentage of each entity to be allocated, the actual values of the entities, the monies and fees received by Charles, and the actual tax liability for those monies were all unknown.

• The parties' agreement as to payment amounts was always dependent on the later determination of the actual values of the entities, the amounts of monies and fees received by Charles, and the actual tax liability of those monies.

• When discussing the KN Companies and Minerva, Ltd. with Charles, it was made very clear to me by Charles that those were simply working numbers as he was quick to point out that the values could change.

Thus, the summary judgment evidence submitted by Nora establishes that the information Charles provided about the assets and their values was understood by all parties to be estimates, not necessarily actual values, and subject to change. The summary judgment evidence also establishes that there was no evidence of the "bona fides" of Charles's representations regarding the identity or value of the marital assets being divided. Therefore, as a matter of law, Nora's reliance on the information Charles provided as informing her of the actual value and identity of the marital assets was not justifiable. *See JSC Neftegas-Impex*, 365 S.W.3d at 407-09 (parties' reliance on representation is not justified when party had actual knowledge of representation's falsity at time of alleged reliance). The summary-judgment evidence submitted by Nora shows that the parties to the negotiation understood that the information Charles provided was assembled by a third party, and that the actual values and tax liabilities of the various entities "were all unknown." In her response to Charles's summary judgment motion, Nora confirms that no evidence was provided during the settlement process to establish the accuracy of

20

representations Charles made as to the identity and value of the assets comprising the marital estate. In her brief on appeal, Nora states that, after signing the Binding Settlement Agreement and before signing the Agreement Incident to Divorce, she "repeatedly asked for" tax returns and financial information from Charles but the documents he sent her were "not verifiable because he did not send [her] copies that had been signed and submitted to the IRS." Despite knowing or believing that the information Charles provided to her was not complete and had not been vetted for accuracy, Nora signed the Agreement Incident to Divorce in December 2016. The summary judgment evidence establishes that any reliance by her on the accuracy of the financial information provided by Charles in doing so was not justifiable as a matter of law. We conclude that the trial court did not err in granting Charles's motion for summary judgment on the ground that the summary-judgment evidence negated justifiable reliance, an element of both Nora's fraud and fraudulent inducement claims. We overrule Nora's first appellate issue. [5]

## CONCLUSION

Having overruled each of Nora's issues on appeal, we affirm the trial court's declarations regarding the proper construction of sections W-13, W-14, and W-15 of the Agreement Incident to Divorce. We also affirm the trial court's summary judgment in Charles's favor on Nora's counterclaims for fraud and fraudulent inducement.

---

[5] Having concluded that the trial court did not err in determining that the summary-judgment evidence negated an element of Nora's fraud and fraudulent inducement claims, we also conclude that Nora's alleged affirmative defense of fraud did not preclude the trial court's summary judgment on Charles's request for declaratory relief and overrule Nora's third appellate issue.

_____

Chari L. Kelly, Justice

Before Chief Justice Byrne, Justices Triana and Kelly

Affirmed

Filed: October 16, 2025